Chief Judge Breitel.
Defendant, following denial of a motion to suppress his incriminating statements, was convicted, after a guilty plea, of third degree robbery (Penal Law, § 160.05). He was sentenced to seven years’ imprisonment. His conviction was affirmed, and he appeals.
The issue is whether a defendant in custody, represented by a lawyer in connection with criminal charges under investigation, may validly, in the absence of the lawyer, waive his right to counsel.
There should be a reversal. Once a lawyer has entered a criminal proceeding representing a defendant in connection with criminal charges under investigation, the defendant in custody may not waive his right to counsel in the absence of the lawyer (People v Arthur, 22 NY2d 325, 329). Any statements elicited by an agent of the State, however subtly, after a purported "waiver” obtained without the presence or assistance of counsel, are inadmissible. Since the purported "waiver” of defendant’s right to counsel was obtained in the absence of his lawyer, who had represented him at a just-completed lineup in connection with the criminal charges, his *482 statements were inadmissible and should have been suppressed.
The facts are undisputed. On February 7, 1973, at approximately 8:30 p.m., defendant entered a delicatessen in Central Islip in Suffolk County. After asking for directions from the owner, George Gundlach, defendant drew a gun and demanded all the cash in the register. After he had received the cash and a number of packages of cigarettes, defendant left.
When the police arrived shortly thereafter, Mr. Gundlach described the robber to Suffolk County Detective Dolan. He then accompanied the detective to the police station, where he eventually identified photographs of defendant as those of the culprit. Mr. Gundlach did state, however, that to be positive he would have to see defendant in person.
Nine months later, on September 26, 1973, defendant was being held in the Suffolk County Jail on charges unrelated to the delicatessen robbery. He was not under arrest for the robbery at that time, although he was a photograph-identified suspect. Defendant was placed in a five-man lineup. Because defendant had requested counsel, Samuel McElroy, a Legal Aid lawyer, was assigned and present to represent him. Mr. Gundlach identified defendant as the robber. Mr. McElroy then left.
After Mr. McElroy left, a Sheriff’s deputy asked Detective Dolan if he desired to speak to defendant. Despite his admitted knowledge that defendant was now represented by counsel on the robbery charge, Dolan replied that he would. The detective had not told Mr. McElroy that he was going to speak to defendant, nor did he make any effort to reach counsel before seeing defendant. At the deputy’s request, defendant signed an undescribed form of "waiver” (which Dolan testified he had never seen) and agreed to speak to Dolan. Defendant was then brought to an "interview” room in the jailhouse.
Detective Dolan read to defendant the standard preinterrogation warnings and asked him if he understood. Defendant said that he did. The detective then asked defendant "Do you wish to contact a lawyer?” Defendant shook his head, indicating "No”. The detective then asked "Having these rights in mind, do you wish to talk to me now without a lawyer?” Defendant replied "Yes”.
Defendant then inquired of Dolan whether he had been identified by Mr. Gundlach, and the detective told him that he *483 had. Expressing a desire to "clear up everything”, defendant in effect confessed to the robbery.
In People v Arthur (22 NY2d 325, 329, supra), the court held: "Once an attorney enters the proceeding, the police may not question the defendant in the absence of counsel unless there is an affirmative waiver, in the presence of the attorney, of the defendant’s right to counsel (People v. Vella, 21 N Y 2d 249). There is no requirement that the attorney or the defendant request the police to respect this right of the defendant.” The rule of the Arthur case has been restated many times (see People v Hetherington, 27 NY2d 242, 244-245; People v Paulin, 25 NY2d 445, 450; People v McKie, 25 NY2d 19, 26; People v Miles, 23 NY2d 527, 542, cert den 395 US 948; cf. People v Stephen J. B., 23 NY2d 611, 616).
This unequivocal and reiterated statement of the law in this State is no mere "dogmatic claim” or "theoretical statement of the rule” (see, contra, People v Robles, 27 NY2d 155, 158, cert den 401 US 945, thus characterizing the rule). It is, instead, a rule grounded in this State’s constitutional and statutory guarantees of the privilege against self incrimination, the right to the assistance of counsel, and due process of law (see People v Arthur, 22 NY2d 325, 328, supra; People v Failla, 14 NY2d 178, 180; People v Donovan, 13 NY2d 148, 151; Richardson, Evidence [10th ed], § 545, at p 546). Indeed, the rule resisted narrow classification of defendants entitled to its protection; it is applicable to a defendant when taken into custody, whether as an "accused”, a "suspect”, or a "witness” (cf. People v Sanchez, 15 NY2d 387, 389).
Of course, as with all verbalizations of constitutional principles, the rule of the Arthur case (supra) is not an absolute. Thus, the fact that a defendant is represented by counsel in a proceeding unrelated to the charges under investigation is not sufficient to invoke the rule (see People v Hetherington, 27 NY2d 242, 245, supra; People v Taylor, 27 NY2d 327, 331-332). The rule applies only to a defendant who is in custody; it does not apply to noncustodial interrogation (People v McKie, 25 NY2d 19, 28, supra). Moreover, the rule of the Arthur case (supra) does not render inadmissible a defendant’s spontaneously volunteered statement (People v Kaye, 25 NY2d 139, 144; cf. People v Robles, 27 NY2d 155, 159, cert den 401 US 945, supra).
The Donovan and Arthur cases (supra) extended constitutional protections of a defendant under the State Constitution *484 beyond those afforded by the Federal Constitution (compare People v Arthur, 22 NY2d 325, 329, supra; and People v Donovan, 13 NY2d 148, 151, supra; with Miranda v Arizona, 384 US 436, 475; and Escobedo v Illinois, 378 US 478, 486-487; see Richardson, Evidence [10th ed], op. cit., at pp 548-549; but cf., e.g., Massiah v United States, 377 US 201, 205-206; United States v Thomas, 474 F2d 110, 112, cert den 412 US 932; United States ex rel. Lopez v Zelker, 344 F Supp 1050, 1054, affd 465 F2d 1405, cert den 409 US 1049, dealing with the right to counsel after the commencement of adversary judicial proceedings).
Notwithstanding that warnings alone might suffice to protect the privilege against self incrimination, the presence of counsel is a more effective safeguard against an involuntary waiver of counsel than a mere written or oral warning in the absence of counsel (see United States v Massimo, 432 F2d 324, 327 [Friendly, J., dissenting], cert den 400 US 1022; compare ALI, Model Code of Pre-Arraignment Procedure [Tent Draft No. 6, 1974], § 140.8, subd [2]; Miranda v Arizona, 384 US 436, 475, supra). The rule that once a lawyer has entered the proceedings in connection with the charges under investigation, a person in custody may validly waive the assistance of counsel only in the presence of a lawyer breathes life into the requirement that a waiver of a constitutional right must be competent, intelligent and voluntary (see People v Witenski, 15 NY2d 392, 395; Matter of Bojinoff v People, 299 NY 145, 151-152; Johnson v Zerbst, 304 US 458, 464). Indeed, it may be said that a right too easily waived is no right at all.
Moreover, an attempt to secure a waiver of the right of counsel in a criminal proceeding in the absence of a lawyer, already retained or assigned, would constitute a breach of professional ethics, as it would be in the least-consequential civil matter (see ABA Code of Professional Responsibility, DR7-104, subd [A], par [1]; People v Robles, 27 NY2d 155, 162 [Fuld, Ch. J., dissenting], cert den 401 US 945, supra; United States v Thomas, 474 F2d 110, 111-112, cert den 412 US 932, supra; United States v Springer, 460 F2d 1344, 1355 [Stevens, J., dissenting], cert den 409 US 873; United States v Durham, 475 F2d 208, 211 [Swygert, Ch. J.]; Coughlan v United States, 391 F2d 371, 376 [Hamley, J., dissenting], cert den 393 US 870; Drinker, Legal Ethics, p 202; Breeder, Wong Sun v United States: A Study in Faith and Hope, 42 Neb L Rev 483, 601; cf. People v Lopez, 28 NY2d 23, 29 [dissenting opn], cert *485 den 404 US 840). Since the Code of Professional Responsibility is applicable, it would be grossly incongruous for the courts to blink its violation in a criminal matter.
Of course, it would not be rational, logical, moral, or realistic to make any distinction between a lawyer acting for the State who violates the ethic directly and one who indirectly uses the admissions improperly obtained by a police officer, who is the badged and uniformed representative of the State. To do so would be, in the most offensive way, to permit that to be done indirectly what is not permitted directly. Indeed, in each of the cases cited above the rejected "waiver” was secured by investigators and not by lawyers.
Moreover, the principle is not so much, important as that is, to preserve the civilized decencies, but to protect the individual, often ignorant and uneducated, and always in fear, when faced with the coercive police power of the State. The right to the continued advice of a lawyer, already retained or assigned, is his real protection against an abuse of power by the organized State. It is more important than the preinterrogation warnings given to defendants in custody. These warnings often provide only a feeble opportunity to obtain a lawyer, because the suspect or accused is required to determine his need, unadvised by anyone who has his interests at heart. The danger is not only the risk of unwise waivers of the privilege against self incrimination and of the right to counsel, but the more significant risk of inaccurate, sometimes false, and inevitably incomplete descriptions of the events described. Surely, the need for and right to a lawyer at an identification lineup is insignificant compared to the need in an ensuing interrogation. If Dick the Butcher said, "The first thing we do, let’s kill all the lawyers”, the more zealous policeman in the station or jailhouse may well say, "The first thing we do, let’s get rid of all the lawyers” (Shakespeare, Henry VI, pt II, act IV, sc ii).
The rule to be applied in this case would be evident, unquestionably evident, on the basis of what has been discussed thus far, but for one significant circumstance. Between September, 1970 and September, 1972 three cases were decided in this court which departed from the evident rule. The reasons for the departure were never made explicit, but nice distinctions were used, if the fact of departure was mentioned at all. On the other hand, the line of cases out of which the Arthur case (supra) arose, as well as the Arthur case itself, was an elaborated legal development, consciously evolved as *486 such, stretching back at least to 1960 (see People v Di Biasi, 7 NY2d 544; and People v Spano, 4 NY2d 256, 264-267 [Desmond J., dissenting], revd 360 US 315). It was not a string of happenstances (see People v Lopez, 28 NY2d 23, 26-28 [dissenting opn], cert den 404 US 840, supra, for a detailed analysis of the development of the right to counsel in this State; but see, in contrast, People v Robles, 27 NY2d 155, 158-160, cert den 401 US 945, supra). The three cases were People v Robles (supra); People v Lopez (28 NY2d 23, cert den 404 US 840, supra), and People v Wooden (31 NY2d 753). The Wooden case simply relied on the Lopez case, without opinion, three Judges concurring on constraint of the Lopez case. The Robles case involved an egregiously brutal and unnatural double murder. The Lopez case also involved a murder. That is perhaps the best that one can speculate about what moved the court, reminiscent of the adage about the influence of "hard cases”.
In the Robles case (p 158), the Arthur rule was discussed as "merely a theoretical statement” and it was said that "this dogmatic claim is not the New York law” citing People v Kaye (25 NY2d 139, supra) and People v McKie (25 NY2d 19, supra), cases which applied as exceptions to the right to counsel doctrine spontaneous statements and noncustodial interrogation. There was further discussion of cases quite beside the issue, turning on coercion, trickery, and the like, as conditions which would require exclusion of interrogations of uncounseled defendants.
Actually the stability of these odd cases has already been undermined, albeit collaterally. The hapless Lopez, defeated in the State courts, went to the Federal courts. There the District Court in an extensive opinion by Judge Marvin Frankel granted habeas corpus relief, adopting the reasoning of the dissenters in the State court as a statement of Federal constitutional principles (United States ex rel. Lopez v Zelker, 344 F Supp 1050, 1054, supra). The Court of Appeals for the Second Circuit affirmed unanimously from the Bench, without opinion (465 F2d 1405, cert den 409 US 1049). (See, also, People v Santos, 85 Misc 2d 602, 608 [NYLJ, March 24, 1976, at p 8, col 6], declining to follow the Lopez case, supra.) As for the Robles case (supra), the Richardson treatise is unsure of its effect on the Arthur line of cases (Richardson, Evidence [10th ed], op. cit, at pp 547-548, listing five unanswered questions). Nor were the distinguished Justices in the Appellate Division for the Fourth Department able to agree (see People v Pellicano, *487 40 AD2d 169 [opn by Mr. Justice Del Vecchio and dissenting opn by Mr. Justice Cardamons]).
The problem this departure from a deliberately elaborated line of cases raises is: What is required of a stable court in applying the eminently desirable and essential doctrine of stare decisis. Which is the stare decisis: The odd cases or the line of development never fully criticized or rejected?
Frankfurter, a stalwart for stability and systemic values in a jurisprudence, and no evanescent impulsive innovator, answered the question rather succinctly. In Helvering v Hal-lock (309 US 106, 119) he said: "We recognize that stare decisis embodies an important social policy. It represents an element of continuity in law, and is rooted in the psychologic need to satisfy reasonable expectations. But stare decisis is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable, when such adherence involves collision with a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience.”
The Di Biasi-Arthur line of cases, stretching over almost two decades, represents "a prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience”. The three odd cases of uncertain root, present recency in time, but surely are in collision with the "prior doctrine”, and in each instance decided by the closest possible margin in the court. They do not merit application of "a mechanical formula of adherence”, just because of their recency.
Stare decisis, if it is to be more than shibboleth, requires more subtle analysis. Indeed, the true doctrine by its own vitality should not, perversely, give to its violation strength and stability. That would be like the parricide receiving mercy because he is an orphan. The odd cases rode roughshod over stare decisis and now would be accorded stare decisis as their legitimate right, whether or not they express sound, good, or acceptable doctrine.
There are many thinkers in the law whose comments on stare decisis bear directly on the problem in this case. Invariably, the concern is with the exercise of restraint in overturning established well-developed doctrine and, on the other hand, the justifiable rejection of archaic and obsolete doctrine which has lost its touch with reality (see, e.g., Heyert v Orange & Rockland Utilities, 17 NY2d 352, 360-361 [Van Voorhis, J.], and cases and materials cited). But one comment *488 by Mr. Justice Von Moschzisker, as long ago as 1924, is especially useful. He said: "From the very nature of law and its function in society, the elements of certainty, stability, equality, and knowability are necessary to its success, but reason and the power to advance justice must always be its chief essentials; and the principal cause for standing by precedent is not to be found in the inherent probable virtue of a judicial decision, it 'is to be drawn from a consideration of the nature and object of law itself, considered as a system or a science’.” (Von Moschzisker, Stare Decisis in Courts of Last Resort, 37 Harv L Rev 409, 414.)
The nub of the matter is that stare decisis does not spring full-grown from a "precedent” but from precedents which reflect principle and doctrine rationally evolved. Of course, it would be foolhardy not to recognize that there is potential for jurisprudential scandal in a court which decides one way one day and another way the next; but it is just as scandalous to treat every errant footprint barely hardened overnight as an inescapable mold for future travel.
While this case involves a narrow issue of the right to counsel in a criminal matter, it necessarily turns on what appears to be binding precedent, and hence, the doctrine of stare decisis. It is not sufficient to limit the discussion of the. doctrine to its application to this case. There is the danger, otherwise, of a misunderstanding of the doctrine’s role in the larger perspective in which this case is but an isolated instance. Indeed, this case is another example in which a treatment of the particular requires treatment of the universal under which it falls.
Distinctions in the application and withholding of stare decisis require a nice delicacy and judicial self-restraint. At the root of the techniques must be a humbling assumption, often true, that no particular court as it is then constituted possesses a wisdom surpassing that of its predecessors. Without this assumption there is jurisprudential anarchy. There are standards for the application or withholding of stare decisis, the ignoring of which may produce just that anarchy.
For one, in this case the court deals with constitutional limitations contained in the Bill of Rights. Legislative correction is confined. Although the limitations are designed to protect the individual against the encroachments of a transitory majority, the principle is well established that in cases interpreting the Constitution courts will, nevertheless, if con *489 vinced of prior error, correct the error (see, e.g., Glidden Co. v Zdanok, 370 US 530, 543; Smith v Allwright, 321 US 649, 665-666; Burnet v Coronado Oil & Gas Co., 285 US 393, 406-407 [Brandeis, J., dissenting]; Von Moschzisker, 37 Harv L Rev 407, 420-421). But the conviction of error must be imperative.
Tort cases, but especially personal injury cases, offer another example where courts will, if necessary, more readily reexamine established precedent to achieve the ends of justice in a more modern context (see, e.g., Victorson v Bock Laundry Mach. Co., 37 NY2d 395; Goldberg v Kollsman Instrument Corp., 12 NY2d 432; Bing v Thunig, 2 NY2d 656; Woods v Lancet, 303 NY 349). Significantly, in these cases the line of precedent, although well established, was found to be analytically unacceptable, and, more important, out of step with the times and the reasonable expectations of members of society.
Always critical to justifying adherence to precedent is the requirement that those who engage in transactions based on the prevailing law be able to rely on its stability. This is especially true in cases involving property rights, contractual rights, and property dispositions, whether by grant or testament (see, e.g., United States v Title Ins. Co., 265 US 472, 486-487; Heyert v Orange & Rockland Utilities, 17 NY2d 352, 360, 362-363, supra [property rights]; United States v Flannery, 268 US 98, 105 [commercial transactions]; Matter of Eckart, 39 NY2d 493, decided herewith; Douglas, Stare Decisis, 49 Col L Rev 735-736 [wills]; cf. Endresz v Friedberg, 24 NY2d 478, 488-489 [wrongful death action under EPTL 5-4.1]; Matter of Brown, 362 Mich 47, 52 [statute pertaining to the descent and distribution of property]). The absence of such factors, on the other hand, makes easier the reassessment of aberrational departures from precedents and accepted principles.
Precedents involving statutory interpretation are entitled to great stability (Matter of Schinasi, 277 NY 252, 265-266; see 20 Am Jur 2d, Courts, § 198). After all, in such cases courts are interpreting legislative intention and a sequential contradiction is a grossly aggregated legislative power. Moreover, if the precedent or precedents have "misinterpreted” the legislative intention, the Legislature’s competency to correct the "misinterpretation” is readily at hand. (See, e.g., People v Butts, 32 NY2d 946, 947; People v Cicale, 35 NY2d 661, 662, concurred in on constraint and decided on authority of People v Carter, 31 NY2d 964.)
There is a more rarely recognized principle, a sort of excep *490 tion to the general rule about the interpretation of statutes by courts. There are statutes drawn in such general terms that it is evident that the legislative intention is that the courts, by their interpretation, indeed construction, fill in, by a case-by-case approach, the skeletal outlines. Those are statutes which apply general and therefore flexible standards. The classic example is that of the antitrust statutes, Federal and State, which apply "rules of reason”. In such cases the degree of flexibility in handling statutory precedents is that much the greater, but still not unlimited. (See Breitel, The Lawmakers, 65 Col L Rev 749, 761.)
There are obviously other principles that do not now come to mind but most likely would share the rationale of those already discussed. Throughout, however, a precedent is less binding if it is little more than an ipse dixit, a conclusory assertion of result, perhaps supported by no more than generalized platitudes. On the contrary, a precedent is entitled to initial respect, however wrong it may seem to the present viewer, if it is the result of a reasoned and painstaking analysis. Indeed, that constitutes one of the bases for treating the Robles and Lopez cases as overruled in principle, just because they did not satisfy the rational test when compared to the line of reasoned and consciously developed cases which-a bare majority in the Lopez and Robles cases found unsatisfactory.
The closeness of a vote in a precedential case is hardly determinative (Semanchuck v Fifth Ave. & 37th St. Corp., 290 NY 412, 420; see 21 CJS, Courts, § 189, at p 307). It certainly should not be. Otherwise, every precedent decided by a bare majority is a nonprecedent—one to be followed if a later court likes it, and not to be followed if it does not like it. In the Semanchuck case, Chief Judge Lehman stated the rule precisely: "Three judges, including the writer of this opinion, dissented from the decision in the earlier case, insofar as it held that the general contractor was not, under the contract, entitled to indemnity from the subcontractor. The controversy over the applicable rule to be followed in the construction of the indemnity agreement has been resolved by that decision. The authoritative force of a decision as a precedent in succeeding cases is not determined by the unanimity or division in the court. The controversy settled by a decision in which a majority concur should not be renewed without sound reasons, not existing here. All the judges of the court accept the *491 decision in the Walters case [Walters v Rao Elec. Equip. Co., 289 NY 57] and the rules which form the basis for that decision as guides in analogous cases.”
Similarly, the accident of a change of personalities in the Judges of a court is a shallow basis for jurisprudential evolution (Simpson v Loehmann, 21 NY2d 305, 314 [concurring opn]; see Minichiello v Rosenberg, 410 F2d 106, 109 [Friendly, J.], cert den 396 US 844). In the Simpson case, the troublesome precedent was all but mint-new; its symmetrical conformance to prior law was facially absent. Nevertheless, the precedent was followed just because it would have been scandalous for a court to shift within less than two years because of the replacement of one of the majority in the old court by one who now intellectually would have preferred to have voted with the old minority and the new one.
The ultimate principle is that a court is an institution and not merely a collection of individuals; just as a higher court commands superiority over a lower not because it is wiser or better but because it is institutionally higher. This is what is meant, in part, as the rule of law and not of men.
Accordingly, the order of the Appellate Division should be reversed, the plea vacated, and the statements of defendant suppressed.