Wachtler, J.
Julia Eckart died on August 13, 1970, survived by her two children, Charlotte Eckart and Frank Darmody, the petitioners in this proceeding. She left a simple *496 will, dated August 4, 1966, in which beginning with the THIRD article, she disposed of her entire estate as follows:
"THIRD: Should they survive me, I give, devise and bequeath to my daughter, CHARLOTTE ANNA ECKART, and to FRANK DARMODY, the son of my divorced husband, Patrick Darmody, the sum of Fifty Dollars each.
"FOURTH: For reasons that to me are good and sufficient, I make no further testamentary provision for my said daughter and Frank Darmody, and I intentionally make no provision for any other of my relatives.
"FIFTH: All of the rest and residue of my property, real and personal, wheresoever situated, owned by me at my death, I give, devise and bequeath to WATCH TOWER BIBLE AND TRACT SOCIETY OF PENNSYLVANIA”.
After the will was admitted to probate, the petitioners served a notice of election "to contest the testamentary disposition for charitable purposes * * * pursuant to the provisions of section 5-3.3 of the Estates, Powers and Trusts Law”. The relevant portion of that statute provides:
"(a) A person may make a testamentary disposition of his entire estate to any person for a benevolent, charitable, educational, literary, scientific, religious or missionary purpose, provided that if any such disposition is contested by the testator’s surviving issue or parents, it shall be valid only to the extent of one-half of such testator’s estate, wherever situated, after the payment of debts, subject to the following:
"(1) An issue or parent may not contest a disposition as invalid unless he will receive a pecuniary benefit from a successful contest as a beneficiary under the will or as a distributee.”
It is conceded that according to the terms of the will ‘ the testatrix has left more than one half of her estate for charitable purposes. The question is whether the petitioners have standing to contest the charitable bequest under paragraph (1) of subdivision (a) of the statute. There is no doubt that they are the children,* and thus the "issue” (EPTL 1-2.10) of Julia Eckart, but the executor urges that they nevertheless lack standing because they will not "receive a pecuniary benefit from a successful contest”. His point is that the testatrix, in *497 the FOURTH article of the will, expressly provided that she did not want her children to share in her estate—beyond the nominal $50 legacies—and this he claims is a kind of negative bequest or disinheritance clause which precludes them from taking any further share in the estate under the will or by the laws of intestacy. He relies on Matter of Cairo (35 AD2d 76, affd 29 NY2d 527).
In Cairo, a testatrix survived by a sister and a grandson, left certain property to her sister but, in the residuary clause, left the bulk of her estate to three charities. Nothing was left to the grandson and in fact she specifically provided in the SIXTH article: "I make no bequest to my grandson Joseph L. Cairo * * * for good and sufficient reason.” The Appellate Division held that the "first rule of testamentary construction is that a will be interpreted to reflect the testator’s intent” and here the "will made clear she wanted no part of her estate to go to” her grandson (Matter of Cairo, 35 AD2d 76, 77, 78, supra). The SIXTH article was thus treated as a negative bequest (see Tarbox, Part Three-Property Law, Decedents’ Estates, 25 Syracuse L Rev 253, 263) or disinheritance clause which barred the grandson from sharing in any property passing by intestacy (see, e.g., Matter of Dammann, 12 NY2d 500; EPTL 1-2.18, subd [a]; 9 Rohan, NY Civ Prac, par 1-2.18 [1], p 1-65). And since he could not benefit from a successful contest, of the charitable bequest, the Appellate Division held that the grandson had no standing to challenge the bequest under EPTL 5-3.3. Our court affirmed, without opinion (29 NY2d 527).
In the case now before us the Surrogate found that Cairo was not controlling. In Cairo the testatrix had left nothing to her grandson and manifested a clear "intent to disinherit entirely”. Here on the other hand he found that in the FOURTH article "the testatrix had assigned different levels of importance to her relatives, and that the contestants enjoyed a somewhat higher standing than the others. When this is coupled with the $50 legacies which the others did not receive, and upon a reading of the entire will, it cannot be said that this testatrix intended to disinherit the contestants should any part of her estate fall into intestacy” Matter of Eckart (72 Misc 2d 934, 937).
The Appellate Division affirmed by a bare majority (48 AD2d 61). In a concurring opinion Justice Christ rejected the distinction drawn by the Surrogate but voted to affirm on the *498 ground that Cairo was wrongly decided and should not be followed. He stated: "The error in Cairo is the search for the testatrix’s intention when the statute is designed to make that intention immaterial. In fact, it presumes that the testatrix intended to give more than one half of her estate to charity and to cut off the issue and/or parent. The very object of EPTL 5-3.3 is to limit what a testator can do in his will by preventing the disinheritance of the family, at the expense of a charity. Unfortunately, Cairo fails to perceive this limitation and in so doing destroys the fulfillment of the legislative purpose.”
In our view, Matter of Cairo is in point and, under its holding, these petitioners would lack standing to contest the charitable bequest. The FOURTH article of the will, the negative bequest provision, is essentially identical to the one in Cairo. The fact that the testatrix here left the contestants $50 is of no significance. If anything, the grant of a nominal bequest to a close relation is the more accepted or customary way of indicating an intent to disinherit. Nor do we find any merit to the petitioners’ argument that the disinheritance clause should have no effect on their intestate rights since it only refers to "testamentary” provisions. No meaningful distinction can be drawn between a clause which expressly leaves, "no bequest” to the contestant, as in Cairo, and one which makes "no further testamentary provision” for his benefit as here. The two clauses are essentially the same and should have the same effect.
Cairo, in short, cannot be distinguished and the primary question is whether it should be followed. As Justice Christ noted, the result reached in the case has been the subject of considerable criticism by the courts and the commentators on the ground that it permits a testator to nullify the statute which was designed to protect his issue and parents from being disinherited by excessive gifts to charity. Under the Cairo holding all he has to do is include a statement in his will expressly disinheriting them. This it has been said emasculates the statute (see Tarbox, op. cit.) and is inconsistent with its terms and legislative history (48 AD2d 61, Christ, J., concurring).
"Precedents and rules must be followed, unless flatly absurd or unjust” (Blackstone, Commentaries on the Law, p 70). Blackstone’s blunt statement of the rule shows that from the earliest times the doctrine of stare decisis did not require a *499 strict adherence to precedent in every instance. In an early case our own court recognized that the doctrine had certain limitations, but it was noted that the court would not depart from its prior holdings, "unless impelled by 'the most cogent reasons’ ” (Baker v Lorillard, 4 NY 257, 261). It is now well settled in this State and elsewhere, that the courts will not, as a general rule, follow a former decision "where it can be shown that the law has been misapplied, or where the former determination is evidently contrary to reason” (Rumsey v New York & New England R. R. Co., 133 NY 79, 85; see, also, 20 Am Jur, Courts, § 187). As Chief Judge Breitel noted in People v Hobson (39 NY2d 479, 488) "stare decisis does not spring full-grown from a 'precedent’ but from precedents which reflect principle and doctrine rationally evolved.”
But the exception is not a hard and fast rule either. There are cases where the need for stability and predictability in the law outweigh the need to purge an erroneous decision. Some precedents are more durable than others.
The source of the existing rule is of course a significant consideration. When the courts themselves have originated the rule, as for instance a common-law rule of tort, the courts will more readily re-examine it and, if necessary, set it aside (see, e.g., Kalechman v Drew Auto Rental, 33 NY2d 397). In cases involving error in the construction of the Constitution or a statute, for sound reasons of policy and practicality, courts are generally more reluctant to change the statutory rule than the constitutional one (People v Hobson, 39 NY2d 479, supra). But if a recent holding interpreting a statute is out of harmony with a long line of well-reasoned opinions, the courts need not wait for the Legislature to repair the damage (see, e.g., Helvering v Hallock, 309 US 106). And even when the error is made at the outset, in an initial decision interpreting a novel statute, the court may at a later date change direction. Thus in Matter of Cameron v Ellis Constr. Co. (252 NY 394, 399) we noted: "In defining, by the process of inclusion and exclusion, the scope of novel legislation, the courts must at first be guided by abstract reasoning and anticipation of probable consequences. Experience may at times demonstrate initial error. Then the error should not be perpetuated by strict adherence to earlier precedents.” These of course are exceptional circumstances. Generally, once the courts have interpreted a statute any change in the rule will be left to the Legislature, particularly where the courts’ interpretation is a *500 long standing one (People v Hobson, 39 NY2d 479, supra; Loughran, 22 Fordham L Rev 1, 7).
Even more significant than the source of the rule, is the nature of the question in issue. In cases involving the transfer of property especially, where it can reasonably be assumed that settled rules are necessary and necessarily relied upon, stability and adherence to precedent are generally more important than a better or even a "correct” rule of law. (Lough-ran, op. cit, p 4.) Conversely, "[tjhere should be greater readiness to abandon an untenable position when the rule to be discarded may not reasonably be supposed to have determined the conduct of the litigants” (Cardozo, Nature of the Judicial Process, p 151). Thus on principle and authority there is generally a strict adherence to precedent in those fields of the law dealing with land titles, commercial transactions and contracts. Apparently the same standard would apply to the rules governing wills. However in this case it should be noted that the will was actually executed several years before the Cairo decision, and in fact some time prior to the enactment of EPTL 5-3.3. And although this particular statute is not limited to wills made after its effective date (L 1967, ch 683, § 1; 9A Rohan, NY Civ Prac, par 5-3.3 [1], p 5-315, op. cit), there is some question as to whether Cairo should be strictly-followed on the hypothesis that the will was made in reliance upon it, or readily disregarded because the will obviously was not.
But, of course, these considerations only come into play once it is demonstrated that the rule established in Cairo is clearly erroneous; that it substantially disrupts the statutory scheme; and that the adoption of a new rule will restore the statute to working order.
EPTL 5-3.3 is descended from the ancient mortmain acts which were designed to prevent charities from amassing great wealth. The problem with this was that "by allowing lands to become vested in objects endued with perpetuity of duration, the lords were deprived of escheats and other feudal profits” (Perin v Carey, 65 US 465, 495). New York’s statute however is not a true mortmain act (Trustees of Amherst Coll, v Bitch, 151 NY 282). It is not based on any hostility to charities, but is simply intended to prohibit "improvident and unjust wills, which deprive the relatives and dependents of the testator of proper consideration in the distribution of his estate” (Hollis v Drew Theol. Seminary, 95 NY 166, 174-175; Trustees of Am *501 herst Coll, v Ritch, supra; Chamberlain v Chamberlain, 43 NY 424, 440). Thus it is similar in purpose to the provision which precludes a testator from disinheriting a spouse (EPTL 5-1.1). For some time the spouse had a dual right to elect to take his or her share under either statute. However the present section has eliminated this duplication since it only refers to issue and parents (NY Legis Doc, 1965, No. 19).
The testator of course could still disinherit his parents and issue by leaving everything to a stranger or a noncharitable organization. However it was felt that this was not a real problem because the "magnetism of the religious or charitable act may be great, while the desire to devote one’s bounty to strangers is not common or an evil requiring special attention” (Joslin, Restriction on Gifts to Charities, 21 Tenn L Rev 761, 764; NY Legis Doc, 1965, No. 19).
Although the statute was intended to benefit a designated class as originally enacted any person who would benefit by the contest was held to be eligible to object (Robb v Washington & Jefferson Coll., 185 NY 485; Decker v Vreeland, 220 NY 326). In 1929 the Legislature acted to correct this by amending the statute to include a requirement that "The validity of a devise or bequest for more than such one half may be contested only by a surviving husband, wife, child, descendant or parent” (L 1929, ch 229, § 3). Following that amendment, a testator intent on leaving his property to charity without contest, could simply provide that in the event of a challenge there would be a gift over to an alternate legatee who was not one of the designated class and thus without standing to contest. This was a fairly certain method of evading the statute unless of course the alternate legatee induced one of the designated class to make the contest and share the proceeds as occurred in Matter of Washburn (12 AD2d 856). The Legislature was concerned about this type of evasion of the statute; not by the testator but by those intended to be protected by the enactment. Thus in 1967 they amended the statute again to preclude an issue or parent from contesting a charitable disposition "unless he will receive a pecuniary benefit from a successful contest as a beneficiary under the will or as a distributee” (L 1967, ch 683, § 1). The requirement was expressly "designed to change the result in Matter of Washburn” (supra) (L 1967, ch 683). This latest amendment provides a testator with a foolproof and now widely known method for completely circumventing the statute (see, e.g., *502 Hoffman, Practice Commentary, EPTL 5-3.3; McKinney’s Cons Laws of NY, Book 17B, EPTL, p 782; see, also, 9A Rohan, NY Civ Prac, par 5-3.3 [4], p 5-322, op. cit.).
Viewed against this background it could well be said that the rationale of Matter of Cairo is inconsistent with the stated legislative purpose. Obviously it is the Legislature’s intent and not the testator’s which should control under the statute. But our affirmance in Cairo, without opinion, does not constitute an indorsement of that rationale (Matter of Sentry Ins. Co. [Amsel], 36 NY2d 291, 295). It is the result that counts, and in our view it cannot be said that the result is clearly erroneous or disruptive of the legislative purpose. True, Cairo permits a testator to easily avoid the statute by expressly disinheriting those who might otherwise challenge the will. But the statute itself permits the same result if the testator simply creates a gift over to one not qualified to contest. In other words it is the statute itself and not the Cairo opinion which disrupts the stated legislative purpose. Adoption of a new rule by this court would not alter the net result, and thus there is no compelling reason to change the established rule. If there is to be a constructive change it should come from the Legislature.
The order appealed from should be reversed.
Chief Judge Breitel and Judges Jasen, Gabrielli, Jones; Fuchsberg and Cooke concur.
Order reversed, with costs to all parties appearing separately and filing separate briefs payable out of the estate, and matter remitted to the Surrogate’s Court, Queens County, for entry of a decree declaring the notices of election invalid.

 Although the will refers to the petitioner Frank Darmody as "the son of my divorced husband”, it is conceded that he is also the son of the decedent by her second husband, Patrick Darmody.