Jasen, J. (concurring).
I concur in the result only. In my view, proper resolution of this case requires a full-scale reexamination of the conceptual underpinnings of Seider v Roth (17 NY2d 111). The Seider case stands for the proposition that a liability insurer’s obligation to defend and indemnify a nonresident defendant is a sufficient asset to support quasi in rem jurisdiction over the defendant. If the court was right in Seider and an insurer’s obligation to defend and indemnify is an attachable asset of a tort defendant, there is no constitutional difficulty. The law is well established that a State may constitutionally garnish a debt owed to the defendant by another. Constitutional questions appear only if the insurer’s obligation is not really a sufficient asset upon which to predicate an assertion of quasi in rem jurisdiction. As has been noted, the court in Seider "could not have decided the substantive question without assuming a reality in the 'obligation’ being attached that would satisfy constitutional standards.” (Simpson v Loehmann, 21 NY2d 305, 316 [Breitel, J., concurring].) If the Seider court was wrong and the insurer’s obligation is an insufficient asset of the defendant, there still is no constitutional problem for, under this circumstance, the "asset” is simply not attachable. However, I fail to see how the substantiality of an asset of a nonresident turns upon the residence of the attaching plaintiff. Phrased somewhat differently, an asset of a nonresident defendant is made no less substantial by the fact that the plaintiff who would seize that asset is not from New York. Indeed, to deny a nonresident plaintiff the right to attach the same debt upon which a resident could sue in itself poses grave questions of fundamental fairness and constitutionality. No court has peviously suggested, much less held, that the substance of an attachable debt is in any way affected, much less diminished, by the nonresidence of the attaching party. Rather than rely, as the majority does, upon a subtle and unreal distinction of doubtful constitutionality, I respectfully suggest that the time for major reappraisal of the abberational Seider decision has come. I would close the lid on this Pandora’s box.
It is hornbook law that a State may attach the property of a nonresident for the purpose of applying that property to the satisfaction of a claim against the nonresident. Property of a nonresident includes tangible debts owed to the nonresident *144 by others. "If there be a law of the State providing for the attachment of the debt, then if the garnishee be found in that State, and process be personally served upon him therein, we think the court thereby acquires jurisdiction over him, and can garnish the debt due from him to the debtor of the plaintiff and condemn it, provided the garnishee could himself be sued by his creditor in that State.” (Harris v Balk, 198 US 215, 222.) Thus, in this State, a money judgment may be enforced against any debt, "which is past due or which is yet to become due, certainly or upon demand of the judgment debtor, whether it was incurred within or without the state, to or from a resident or non-resident, unless it is exempt from application to the satisfaction of the judgment.” (CPLR 5201, subd [a].) Similarly, any assignable or transferable property may be applied to the satisfaction of a money judgment. (CPLR 5201, subd [b].) Any debt or property against which a money judgment may be enforced is subject to attachment. (CPLR 6202.)
The attachment of property of or debts owed to a nonresident defendant is a permissible means of acquiring jurisdiction over the nonresident, at least to the extent of the value of the asset attached. Of course, a State could not blanketly refuse to permit nonresidents to use the process of the courts to attach property of their debtors. The right to sue and defend in the courts is "one of the highest and most essential privileges of citizenship, and must be allowed by each State to the citizens of all other States to the precise extent that it is allowed to its own citizens. * * * But any policy the State may choose to adopt must operate in the same way on its own citizens and those of other States. The privileges which it affords to one class it must afford to the other. Any law by which privileges to begin actions in the courts are given to its own citizens and withheld from the citizens of other States is void, because in conflict with the supreme law of the land.” (Chambers v Baltimore & Ohio R. R. Co., 207 US 142, 148-149.) This is no simple equal protection problem. A State may not deprive nonresidents of a privilege of citizenship. (US Const, art IV, §2.) The majority’s silence on the issue speaks for itself.
The majority concludes that nonresidents may not under any set of circumstances attach debts of their debtors which the Seider decision permits New York residents to attach. In other words, the court adopts a policy which precludes nonres *145 idents from using the processes of the courts to the same extent as New York residents. In my view, this is unconstitutional. The issue may be seen more clearly if viewed in terms of a tangible asset, such as a bank account. Certainly it would be unconstitutional to refuse to permit nonresidents to attach monetary assets of debtors located in New York while permitting New York residents to attach the same assets. In effect, this would deny nonresidents full rights to court process. Seider, of course, holds that the insurer’s obligation to defend and indemnify is the functional equivalent of a debt. To deny nonresidents the process of the courts to reach debts reachable by New Yorkers is an unconstitutional discrimination in favor of local residents. Furthermore, such a policy is fundamentally unfair. For example, if this plaintiff has a liability insurance policy issued by an insurer located in New York, under the majority decision, a New Yorker could attach the obligations of that policy and subject this New Jersey plaintiff to quasi in rem jurisdiction in New York. The plaintiff, however, is barred from using the same court process that could be used against her.
This is not to say that a nonresident is entitled to maintain a suit in New York where the cause of action has no substantial connection with this State. (Cf. Minichiello v Rosenberg, 410 F2d 106, 110 and n 6.) Such a suit would be subject to dismissal on the ground of forum non conveniens. (CPLR 327.) But a suit by a New Yorker is subject to dismissal on the same ground. (See Silver v Great Amer. Ins. Co., 29 NY2d 356.) However, the application of forum non conveniens turns upon considerations of justice, fairness and convenience and not solely upon the residence of one of the parties. (29 NY2d, at p 361.) There may well be cases in which there are sufficient special circumstances which warrant retention of jurisdiction over Seider suits commenced by nonresidents. For example, in this case, the courts below have found that the fact that one of the independent tort-feasors is a New Yorker and that one of the tortious acts complained of occurred in New York is a sufficient special circumstance to preclude the application of forum non conveniens. The majority does not claim, nor could it be successfully argued, that such decision was an abuse of discretion as a matter of law. (See Irrigation & Ind. Dev. Corp. v Indag, S. A., 37 NY2d 522, 525.)
Nor should the court choose to limit Seider on a pure policy analysis. As noted in Vaage v Lewis (29 AD2d 315, 316), relied *146 upon by the majority, ”[y]et we must be mindful of the fact that the accident of a plaintiff’s residence does not bear directly on the substance of a court’s jurisdiction and power over a defendant, particularly when an in rem concept is involved. When the res is here in New York, that is the jurisdictional fulcrum.” Indeed, one of the most noted critics of Seider, Professor Siegel, has rejected a similar analysis. "If the debt is in New York it is here whether plaintiff is from New York or the Netherlands. It is here if there is no plaintiff at all, or no litigation at all, or no court system at all. The one thing is a universe removed from the other.” (Siegel, Supplementary Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR 5201 [Cumulative Annual Pocket Part, 1976-1977], p 32.) The policy approach is precluded by sheer logic. Additionally, there should be no fear of a flood of suits by nonresidents since the nonresident with substantial New York contacts sufficient to defeat a forum non conveniens attack is a comparative rarity. If the majority is concerned with the inundation of New York courts by waves of law suits, the problem is created by Seider itself and should be addressed directly.
It is true that the Federal courts have indicated that it might well be unconstitutional to extend Seider to cover nonresident plaintiffs. (See, e.g., Minichiello v Rosenberg, 410 F2d 106, supra; Farrell v Piedmont Aviation, 411 F2d 812; Varady v Margolis, 303 F Supp 23.) However, the reasoning of these courts is predicated upon the view that Seider constitutes a judicial direct action statute and that New York has no interest in permitting direct actions in favor of nonresidents. (Cf. Watson v Employers Liab. Corp., 348 US 66.) The analogy to direct action statutes is inapposite since Seider is based upon traditional quasi in rem jurisdictional analysis which emanates from Harris v Balk (198 US 215). Harris, the pre-eminent American case to date on quasi in rem jurisdiction, involved the attachment of a debt of $180 owed to a nonresident defendant by another nonresident. Jurisdiction over the garnishee was acquired through the service of process upon the garnishee while he was temporarily within the forum State. Although, in modern times, the view has been expressed that due process is denied a defendant who must defend in a foreign State simply because his garnishee happened to be found there, Harris remains, as of today, an authoritative precedent. Until such time as the Supreme *147 Court chooses to overrule it, and that time may not be far off, State courts are bound by it. Assuming that an insurer’s obligation to defend and indemnity is properly determined to be a debt, such debt is just as substantial as the $180 at issue in Harris, a sum of comparative insignificance even in that pre-inflationary era. Critically, if a foreign insurer is made to defend here by the chance that it does business in New York, any due process strain generated by that burden is hardly mitigated by the residence of the plaintiff. The strain is created by the fact that the insurer must defend; to the insurer it hardly matters who it must defend against.
Contrary to the implication in the majority opinion, we have never said that Seider was, in fact, a judicially created direct action statute. The statements to which the majority alludes were made in response to arguments that Seider represented an arrogation of legislative responsibility. We specifically noted in Seider that the direct action analogy was a limited one and that jurisdiction was obtained because the policy obligation to defend and indemnify should be considered a debt owed to the insured by the insurer. (Seider v Roth, 17 NY2d 111, 114, supra; see, also, Simpson v Loehmann, 21 NY2d 305, 311, supra.) Judicial creation of a direct action statute is a contradiction in terms. Courts do not, or at least should not, legislate. Moreover, Seider is at best an indirect direct, action doctrine since the insured is at least a nominal defendant. In fact, if the insured fails to co-operate with the insurer in maintaining a defense, the insurer has the option of disclaiming coverage. Furthermore, even a direct action statute would permit suit by a nonresident, provided the underlying tort occurred in New York. (See Simpson v Loehmann, 21 NY2d 305, 317-318, supra [dissenting opn].) To term Seider a direct action statute does not progress analysis, nor does it justify the result reached by the majority.
Thus, the ultimate issue is reached; if Seider is a viable decision, plaintiff’s nonresidence should not preclude its application. Only if Seider is overruled, may jurisdiction be appropriately disclaimed.
I believe that Seider should be overruled. Doubtless the obligation to defend and indemnify is a valuable right but the "debt” of the insurer it represents is inchoate and conditional and attachment is thereby precluded. (See CPLR 5201, subd [a].) The law prior to Seider was clear that contractual rights which were not yet translatable into a present duty were too *148 inchoate to be attached. (E.g., Sheehy v Madison Sq. Garden Corp., 266 NY 44.) After Seider, in all other spheres, the law was equally adamant: absent a present duty, there is no debt. (Glassman v Hyder, 23 NY2d 354, 359.) The obligation to defend and indemnify is an important right. The duty to defend may even be more important than the duty to indemnify, at least where the action is for more than the policy limits. However, neither duty is severable from the insurance policy which creates it. The obligation to defend and indemnify remains inchoate until jurisdiction has been duly acquired over the insured. (Matter of Riggle, 11 NY2d 73.)
Nor is the obligation attachable as an interest in property (see CPLR 5201, subd [b]) since it is a property interest without any realistic independent economic value. Although an economic value has been assigned more or less arbitrarily (see Simpson v Loehmann, 21 NY2d 305, 310, supra), the obligation, until it has ripened, has no real economic significance. (ABKCO Inds. v Apple Films, 39 NY2d 670, 675-676.) It is unassignable and unmarketable and execution upon it would be most impracticable.
Seider, thus, is out of line with the major precedents on attachment in this court. At least nine States and two Federal courts have rejected it. (See, e.g., Javorek v Superior Ct. of Monterey County, 17 Cal 3d 629.) The only highest court of a sister State to apply the Seider rule limits its effect only to where a local resident commences an action against a New York resident. (Forbes v Boynton, 113 NH 617; see Robitaille v Orciuch, 382 F Supp 977.) Critical commentary has been unfavorable.
The majority does not defend Seider; the court places its reliance solely upon stare decisis. Indeed, the court’s apparent policy decision to preclude nonresidents from employing Seider reflects the court’s discomforture with the case. Yet where a court is convinced of the error of a prior decision, it should be forthright enough to depart from it, rather than to resort to subtle and unreal distinctions. (See, e.g., Von Moschzisker, Stare Decisis in Courts of Last Resort, 37 Harv L Rev 409, 411-412.) This is especially true where, as here, the purported distinction is of doubtful constitutional validity. While, without doubt, prior decisions are entitled to great weight, stare decisis does not require blind deference to flagrant error. In view of Seider’s own deviation from prior precedent, the virtually unanimous negative reception from *149 neutral courts and commentators, and the unending list of practical difficulties which flow from the decision, there are "the most cogent reasons” for reconsideration. (Rumsey v New York & New Eng. R. R. Co., 133 NY 79, 85.)
We have recently said that "if a recent holding interpreting a statute is out of harmony with a long line of well-reasoned opinions, the courts need not wait for the Legislature to repair the damage”. (Matter of Eckart, 39 NY2d 493, 499.) There is no suggestion here that Seider involves a long-standing rule governing the transfer of a property interest, a circumstance which would compel invariable adherence to precedent however wrong. (Matter of Eckart, supra; People v Hobson, 39 NY2d 479, 489.) Seider is simply an interpretation of a procedural statute and procedure admits a greater flexibility than does substantive rules of law. As Chief Judge Fuld stated in Silver v Great Amer. Ins. Co. (29 NY2d 356, 363, supra) "stare decisis does not compel us to follow blindly a court-created rule—particularly one, as here, relating to a procedural matter—once we are persuaded that reason and a right sense of justice recommend its change.”
Particularly in the past few years, our court has shown no reluctance to dispose of prior precedents when necessary to achieve a proper disposition. (E.g., Basso v Miller, 40 NY2d 233; Scurti v City of New York, 40 NY2d 433; People v Hobson, 39 NY2d 479, supra; Micallef v Miehle Co., 39 NY2d 376; People v Miller, 39 NY2d 543; Victorson v Bock Laundry Mach. Co., 37 NY2d 395; Kalechman v Drew Auto Rental, 33 NY2d 397.) In each of these decisions, and this list is by no means exhaustive, we have overturned established precedent even though the Legislature had not acted to controvert the rules established in the earlier decisions. It has long been my view that the courts may reform their own rulings on law without the need to await salvation from the Legislature. (See Codling v Paglia, 32 NY2d 330, 345-348 [concurring opn].) The Legislature did attempt to enact a "direct action” statute, in lieu of Seider, but the proposed enactment was vetoed by the Governor. (See Governor’s veto message, NY Legis Ann, 1973, p 349.) Since the Legislature would have repealed Seider, but for the Governor’s veto (which was based on a drafting deficiency and not upon the merits of the legislation), the majority’s conclusion that the Legislature is "satisfied with it” (p 142) is simply untenable. But, in any case, it is my view that a court may, and should, rectify prior error in statutory inter *150 pretation and should not place the burden upon the Legislature to redraft the statute.
The majority makes much of the fact that we recently "reaffirmed” the Seider case in Neuman v Dunham (39 NY2d 999). However, that case did not present the same challenge as does the present one. In Neuman, the plaintiff was a resident of New York. Here, the plaintiff is a nonresident and the fact of nonresidence raises a different issue. The majority would leave Seider intact but not extend it. I see no valid basis upon which the refusal to extend may be predicated. Thus, the issue becomes whether Seider itself is a viable decision. The fact that we have recently relied upon a precedent does not preclude us from overruling that precedent in a case presenting even slightly different circumstances. (Compare Meyer v Gehl Co., 36 NY2d 760 [March 24, 1975], with Micallef v Miehle Co., 39 NY2d 376, supra [April 8, 1976].)
Shortly after Seider was decided, it was stated that a major reappraisal by the court, as an entity, would justify the overruling of Seider. (Simpson v Loehmann, 21 NY2d 305, 314, supra [Breitel, J., concurring].) The Simpson case was decided within two years of Seider when Seider "was all but mint-new”. (People v Hobson, 39 NY2d 479, 491.) An important precedent, clearly, should not be disavowed simply because, as a matter of happenstance, the composition of the court had changed. (See, also, Simpson v Loehmann, 21 NY2d 990, supra.) However, we are now nearly 10 years down the road and the precedent, once mint-new, is severely tarnished. Overruling Seider at this stage would not result from an accident of composition but from an institutional reassessment. There is no danger that the precedent would be abandoned simply because one Judge, and later a second, in the majority had been replaced by another Judge who would have preferred a different result.
There are those who would argue that Seider is much ado about nothing; a case of insufficient importance to warrant further scrutiny. A second contention arises from concern for adverse Statute of Limitations effect upon cases brought in reliance upon Seider. To answer the first argument, it is obvious that all members of the court deem the issue to be one of importance. If the majority felt the issue to be unimportant, it would be unnecessary for them to fear the effects of extending Seider to nonresidents. Cases, such as the present one, with substantial New York contacts precluding the use of *151 forum non conveniens would be rare. To bar the odd nonresident plaintiff, with significant New York contacts, from the New York courts, based upon a constitutionally doubtful distinction, would be unduly harsh if the issue is of only slight concern. The second consideration is more substantial. A full and retrospective abandonment of Seider might, indeed, have adverse Statute of Limitations impact upon plaintiffs who relied upon Seider. The present case poses no such difficulty. Plaintiff was aware, or should have been, that the benefits of Seider might not be available to her and, thus, any reliance placed upon Seider was unreasonable. At least as to her, there is no difficulty in abandoning Seider. Under the majority’s analysis, the limitations result is no different.
To conclude, Seider is an odd case which rode overshod over stare decisis. The majority would accord it stare decisis effect, but would not extend it, even though the soundness of its doctrine has been seriously questioned. The issue, quite similar to that posed in People v Hobson (39 NY2d 479, 487, supra) is whether stare decisis should be accorded to the odd case, heavily criticized and unanimously rejected, or the stable line of development never criticized and never rejected. The answer should be obvious. I would orverrule Seider v Roth. A court should have the wisdom and the institutional fortitude to both explore new fields when necessary and to retract when experience and mature reflection establish, beyond doubt, the weakness of a prior approach.