Meyer, J.
(dissenting). Recognizing, as Chief Judge Breitel put it in his eloquent exegesis on stare decisis in People v Hobson (39 NY2d 479, 491) that "the accident of a change in personalities in the Judges of a court is a shallow basis for jurisprudential evolution”, I would concur on constraint of the precedents on which the majority rely were it not that there are, in my view, strong reasons grounded in considerations of both stare decisis and statutory construction for not doing so.
The essence of stare decisis is the value of stability in the law so that those who are governed by it may act in reliance upon the fact that it will not be lightly overturned. But the doctrine is "not a mechanical formula of adherence to the latest decision, however recent,” (Helvering v Hallock, 309 US 106, 119). Thus, we have consistently recognized the duty to re-examine a prior determination which is contrary to reason (Matter of Eckart, 39 NY2d 493, 499; Rumsey v New York & New England R. R. Co., 133 NY 79, 85), and have, accordingly, overruled an election law interpretation only four and one- *25 half months after it was handed down (Matter of Turner v Lawley, 25 NY2d 963, decided Oct. 28, 1969; overruling Matter of Gaines v Board of Elections, 25 NY2d 807, decided June 11, 1969).
Departure from prior precedents is not only authorized but required when the court is "satisfied, in the first place that they were wrongly decided, and in the second place, that less mischief will result from their overthrow than from their perpetuation” (Black, The Law of Judicial Precedents [1912 ed], p 10; see Matter of Eckart, supra, at p 493). Important in determining when prior decisional law must be followed and when it may be departed from are the nature of the interest involved (People v Hobson, supra, at p 489), "whether the law is serving its true function — the achievement of justice according to law” (Loughran, Some Reflections on the Role of Judicial Precedent, 22 Fordham L Rev 1, 16), the intrinsic quality of the precedent relied upon (Schaefer, Precedent and Policy, 34 U Chicago L Rev 3, 10), whether it is grounded in sound public policy, is working well or badly, will create injustice in the particular case (Kenison, Some Preliminary Observations on the State Appellate Judge Today, 61 Col L Rev 792, 795).
Examined in the light of these considerations, the precedents upon which the majority rely simply do not measure up. The citizen’s right to run for public office as well as his or her right to vote are deemed so significant in our system of government that a State statute impeding the right of access to the ballot will not be accorded the usual presumption of constitutionality (Kramer v Union School Dist., 395 US 621, 627; see, also, Lubin v Panish, 415 US 709; Kusper v Pontikes, 414 US 51; Dunn v Blumstein, 405 US 330; Bullock v Carter, 405 US 134; cf. Matter of Ramos v Alpert, 41 AD2d 1012, 1014, affd 32 NY2d 903). A precedent which results in the frustration of the right to become a candidate for office is, therefore, by its very nature suspect. The interests that will be impeded by reversal of Matter of Morris v Hayduk (45 NY2d 793) and its predecessors, can only be characterized as insubstantial by comparison. Those within the same or another political party who aspire to run for the same office will have been misled only to the extent that they expended time and money in inserting in their own petitions the assembly district number, surely a de minimis consideration, or in opposing the special proceeding at its various levels, an infirmity of all litigation under the American as distinct from the *26 British system of justice. Other office seekers frustrated in their ambitions by the application of the Morris rule by the board of elections or a lower court may also, because of the existence of Morris and the cost of litigation, have concluded that further appeal was fruitless, but surely that "loss” is offset by the greater ease of becoming a candidate in the future that the overruling of Morris will provide, and in any event such an interest is much more evanescent that the property and commercial interests which spell adherence to rather than departure from erroneous precedent in most applications of stare decisis.
It seems apparent, moreover, that the decisions in question are not working well as precedents, for they clearly have not educated potential candidates to the difference between what the language of section 6-132 considered as a whole appears to require and what this court has held in Matter of Morris (supra) and its predecessors the section does require. To speak authoritatively on the issue one would have to survey at the election board level the number of designating petitions invalidated for failure to insert the assembly district against the total number of petitions filed, but the constant parade of cases involving the section before this court (Matter of Alper v Hayduk, 45 NY2d 809; Matter of Klemann v Acito, 45 NY2d 796; Matter of Morris v Hayduk, 45 NY2d 793, supra; Matter of Vari v Hayduk, 42 NY2d 980; Matter of Rutter v Coveney, 38 NY2d 993; Matter of Berry v Dodd, 38 NY2d 995) and which it has had to consider during this 1979 "election” session (no less than 4 of the 20 cases, including the instant case; Matter of Brown v Ulster County Bd. of Elections, 48 NY2d 614; Matter of Wheeler v Reddy, 48 NY2d 601; Matter of Vickers v Carlsen, 48 NY2d 601) provides a fair basis for the conclusion when one considers the expense of litigating the issue and the inertia induced by the belated discovery that Morris and not the apparent meaning of the section governs and that there is the added burden of stare decisis to overcome.[1] Nor is there much solace for those who would follow Morris in the aphorism that everyone "is presumed to know the law”, for, as we long ago recognized, that is "a trite, sententious saying, 'by no means universally true’ ” (Municipal Metallic Bed Mfg. Corp. v Dobbs, 253 NY 313, 317), and *27 one which, if applicable at all, more readily applies to the law as apparently declared by the wording of a statute, than to the decisional law which interprets the statute, ibid. Thus, the "self-help alternative” to which the majority refers (at p 20) is, at best, illusory, and if statistical support concerning the number of petitions invalidated under the Morris interpretation is not presently available, neither is there support for the majority’s conclusion that "only the careless or inadvertent failure to follow the mandate of statute and case law” (at p 20; emphasis supplied) gives rise to the cases that come before us.[2] The true number may well lie between the two assumptions, indeed could well lie closer to the majority’s assumption than to mine without changing my view that when the result is to constrict citizen participation in the governmental process we should not assume the knowledge of case law construction diverging from the apparent meaning of statutory language that the italicized words in the above quotation from the majority opinion in fact assumes.[3]
Nor should the possibility of legislative correction of the Morris interpretation deter us. The majority recognizes (at p 19) that this court "may properly step in to eífect a change in statutory interpretation”, but concludes that we should not because of the relative ease of accomplishing statutory change, the greater capability of the Legislature to gather relevant data and the fact that our system of government assigns to the Legislature responsibility for determining election law policies. As Professor (now Judge) Robert E. Keeton put it in Venturing to do Justice: Reforming Private Law (at p 17): "the aphorism that a legislature’s failure to enact a change is an expression of approval of the law as it stands is a patent fallacy”. To the reasons he assigns (the ever increasing demands upon the legislators’ time and the fact that the majority individually may have no point of view on the issue in question), I would add the realities of the legislative process. We should not assume that those whose candidacies are frustrated by the Morris interpretation have the constituency to produce legislative change, that provisions *28 written into the Election Law as part of an over-all revision and under the legislative pressures that such a rewriting brings to bear will necessarily be restored when piecemeal amendment is required to overcome an erroneous decisional interpretation of an isolated section, or that under our political system the interest of a majority of legislators will always be to restore to the statute by amendment the meaning originally legislated (cf. majority, at pp 20-21; see, generally, Friendly, op. cit. [at p 27, n 3], at pp 792-798, 801-802).
If we turn to consideration of the intrinsic quality of the precedent, Election Law interpretations should be deemed more readily subject to correction by the court than its decisions construing other statutes. This is not because the courts are in any sense cavalier in their consideration of such cases but quite simply because section 16-116 of the Election Law requires that special proceedings brought under the law "be summarily determined” and be given "preference over all other causes in all courts”. The speed with which such proceedings must be researched and prepared by the attorneys involved in them, with which the proceedings move through the courts (often moving from election board to Special Term to the Appellate Division and to this court in little more than a week), with which decision must be reached by each of the courts that considers the matter (in most cases limiting to hours rather than days the time from argument to completed opinion), and the unorganized nature of the "record” (if it can be dignified with that title) upon which the courts must act, all suggest that decisions construing the Election Law are entitled to less respect as precedents than statutory construction decisions that move through the courts at an infinitely more leisurely pace (generally years, or at least more than a year, as compared with weeks and almost always less than a month from lower court inception to ultimate determination by this court).
The way is, thus, open, within the confines of stare decisis to re-examine the interpretation of the statute. Cardinal in that interpretation is that statutory language is to be construed in accordance with its commonly accepted meaning (People v Hardy, 47 NY2d 500, 505; Matter of Common Council of City of Gloversville v Town of Johnstown, 37 AD2d 459, 460, revd on other grounds 32 NY2d 1; see 1 McKinney’s Cons Laws of NY, Statutes, §§ 94, 272). Section 6-132 of the Election Law contains in subdivision 1 the language acceptable as a desig *29 nating petition and in subdivision 2 the language acceptable as a subscribing witness’ statement to such a petition. The body of the petition calls for the statement of "Ward (if any) or Assembly District (in the city of New York and in the towns in the county of Nassau)”, and the witness’ statement requires that he or she indicate his residence address and election district and indicate the "Ward/ Assembly district (fill in Ward, if any, otherwise fill in Assembly District where required)”. The clear import of that language (the more especially since "where required” is nowhere else defined in the Election Law) is that the assembly district is only required "in the city of New York and in the towns of the County of Nassau”. The contrary interpretation given the section in Matter of Morris, is predicated on prior decisions, the distinction between signers and subscribing witnesses suggested by comparison of sections 6-130 and 6-132 and the failure of the 1978 Legislature to adopt bills which apparently would have spelled out the meaning of "where required” in subdivision 2 of section 6-132. Since Morris was not decided until after adjournment of the 1978 legislative session that failure should not be accorded any greater significance than the fact, overlooked in Morris, that the title of section 6-130 is "Designating petition; form, witness, qualification”. (Emphasis supplied.) I do not blink the facts that section headings are at best an aid to construction (1 McKinney’s Cons Laws of NY, Statutes, § 123, subd b) and that the body of section 6-130 refers only to signers. I refer only to the section heading as an additional reason for a legislative belief that, as is also called for by the general rule of construction (1 McKinney’s Cons Laws of NY, Statutes, § 130), sections as closely related in subject matter as these were intended to be and would be read together, and thus as possibly explaining why the bills to which the Morris decision referred were not enacted into law. The point is not that my speculation is stronger than that relied upon in Morris but that a right of the importance of that in question should not be frustrated on the basis of so thin a reed.[4]
The reasonableness of interpreting "where required” in subdivision 2 of section 6-130 to refer back to subdivision 1 is underscored by the undisputed evidence in this case that the *30 present petitioner Paul N. Higby, seeking the Republican Party’s nomination for Town Councilman in the Town of Orchard Park, inquired of an election board official whether he was required to have subscribing witnesses insert the assembly district number in his petitions, was told that that was not required, and submitted petitions which uniformly omitted that number.[5] Thus, even the cognoscenti of the election commissioner’s staff are not all aware of our construction of the section and interpret the language according to the common speech of men. Clearly, therefore, the construction constitutes a trap for those not so knowledgeable, into which, as already suggested, many unwittingly fall.
The more egregious does the problem become when one bears in mind that in many instances, as in the Town of Orchard Park, the town is entirely contained within one assembly district. Thus, there is no possibility that the insertion of the assembly district number could have added anything by way of convenience or reliability in the process of checking the validity of the signatures to the petition. While there may be the possibility of confusion with respect to petitions for office in places other than the City of New York and the towns of the County of Nassau, it seems more than likely in light of the express reference to the city and the County of Nassau that the Legislature would have used more narrowly drawn language than "where required” as the means of reaching those cases had it intended to reach them.
In final analysis, the problem comes down to which precedent should be followed: Matter of Turner with respect to stare decisis or Matter of Morris with respect to the interpretation of section 6-132. For me the answer is plain. Bearing in mind the importance of citizen access to the ballot and the continuing problem presented by the Morris interpretation, the stability. value in following precedent is clearly overbalanced. As Mr. Justice John M. Harlan stated in Moragne v States Mar. Lines (398 US 375, 405), "judicious reconsideration of precedent cannot be as threatening to public faith in the judiciary as continued adherence to a rule unjustified in reason”.
For the foregoing reasons, I would reverse the order appealed from and reinstate the Special Term order.
*31 Chief Judge Cooke and Judges Jasen, Gabrielli, Jones and Wachtler concur in Per Curiam opinion; Judges Fuchsberg and Meyer dissent and vote to reverse in separate dissenting opinions.
Order affirmed, without costs.

. As Justice Roger J. Traynor has so succinctly put it, "a bad precedent is easier said than undone” (Traynor, La Rude Vita, La Dolce Giustizia: Or Hard Cases Can Make Good Law, 29 U Chicago L Rev 223, 231).

. Clearly the present petitioner, Higby, was neither careless nor inadvertent (see infra this dissent, at pp 29-30).

. See the reference in Friendly, The Gap in Lawmaking — Judges Who Can’t and Legislators Who Won’t (63 Col L Rev 787, 792) to the claim "that citizens ought to be able to rely on what they read in the statute book, especially in areas in which citizens make plans on the basis of what they read”.

. Compare Boys Market v Clerks Union (398 US 235, 241) characterizing it as " 'at best treacherous’ ” to find in legislative silence the acceptance of decisional law. (See, also, Hart, Comment in Legal Institutions Today and Tomorrow, pp 40, 45-48 [Paulsen ed, 1959].)

. Higby urges that there should be an estoppel in his favor, but estoppel is not ordinarily applied against governmental officials (Matter of Farrell v Morton, 268 NY 622).