OPINION OF THE COURT
Richard W. Wallach, J.
What are the constitutional limitations of covert police activity when conducted against a charged and arraigned defendant in the absence of his counsel? And which side shall properly bear the burden of proof in justification of such a *981 police operation when defendant moves, as here, to suppress the damning evidence of his guilt obtained by such official stealth and cunning?
On September 19, 1977, Arun Kothari, an Indian diamond merchant, picked up a $150,000 diamond shipment at the United States Customs House in lower Manhattan and entered the subway. At the West 4th Street IND station he was attacked and robbed by three young toughs. One of the assailants was seized at the scene; his arrest led quickly to the apprehension of the two other robbers. One of these thieves turned out to be the next door neighbor of defendant Leon Schwimmer, himself a diamond dealer. Upon rather tenuous evidence connecting Schwimmer as the fingerman of the victim, the mastermind of the plot, and the potential fence of the loot, the police sought to arrest Schwimmer as a fourth culprit. When Schwimmer learned the police were looking for him, his lawyer surrendered him for arrest the following day at the District Attorney’s office on the understanding that Schwimmer was not to be questioned. This arrangement was scrupulously respected, and three days later Schwimmer was released on $25,000 bail.
At this point the case against Schwimmer was very weak— so feeble that a case against him could not even be presented to the Grand Jury. A month later, however, this situation was to undergo a dramatic change. On the evening of October 18, Schwimmer met in a car with two men whom he believed to be seasoned hit men well connected with organized crime. But these two were merely masquerading as Mafia-type hoods; one was police department informant No. 7000, and the other was undercover Police Officer Joseph Coll. The latter was armed with a concealed tape recording device, and the entire discussion was clearly recorded.
In the course of the recorded conversation, it is evident that Schwimmer was hoping to enlist two new and more reliable recruits than the fumbling trio who had botched up the West 4th Street subway robbery. With undiminished confidence in his basic criminal scheme, Schwimmer proposed to teach them how to lurk outside the Customs House, how to spot potential couriers of large diamond shipments, and how to rob them in fast and daring daylight street assaults. In the course of the meeting, some boasting as to criminal prowess took place. Unfortunately for Schwimmer, his part of this interchange included explicit reference to his full participation in the West *982 4th Street subway robbery, and his smug possession of over two thirds of the unrecovered loot. Understandably, this taped conversation enabled a Grand Jury on November 10, 1977 to indict Schwimmer with the crimes of robbery in the second degree and criminal possession of stolen property in the second degree. It is this taped conversation which Schwimmer now moves to suppress as illegally obtained.
The main prosecutorial barrier to use of this incriminatory tape on Schwimmer’s trial is the fact that at the time it was made, Schwimmer was represented by counsel, and counsel’s existence (although not his identity) was known to the undercover police team. It is now settled that an indicted defendant is not immunized from all police contact if it results from his attempt to commit a separate crime, arid the police involved in the second investigation are unaware of the suspect’s status in the earlier case and his representation by counsel (People v Clark, 41 NY2d 612). In Clark, defendant had been indicted in Nassau County for the armed robbery of a victim in his home, and the taking of a valuable gold coin collection. Prior to trial, defendant attempted to sell the collection through an undercover New York City police officer posing as a "fence”. The Court of Appeals sanctioned the use of the tape recorded telephone "fencing” conversations in the Nassau prosecution on the ground that the attempted sale of the stolen coins was a separate crime, and the New York City police had no knowledge of the earlier indictment. The court held that the leading New York cases which bar police access to a defendant represented by counsel to investigate the crime with which he is charged (People v Arthur, 22 NY2d 325; People v Hobson, 39 NY2d 479), have no application to the situation where the police are in good faith investigating an entirely different crime. The critical issue here is whether the admitted police knowledge of defendant’s pending criminal charge and his representation by counsel preclude the possibility of good faith. Clark would seem to answer no, and tells us that what is interdicted are "deliberate efforts by law enforcement officials to elicit incriminating statements” (supra, p 615; italics added). The exception to the summoning of counsel carved out in Clark (supra, p 615) is defined as "where the police are engaged in no such deliberate attempt but are instead pursuing a good faith investigation, neither the need nor the purpose for the rule is furthered by its application.” (Emphasis added.)
*983 As even more pointedly observed in Grieco v Meachum (533 F2d 713, 718), "the pendency of an indictment does not immunize a defendant from accountability for statements made in the commission of another crime, even though made to a government agent in the absence of counsel.”
Thus, attention must now focus upon the evidence adduced at the suppression hearing which would tend to establish police good faith, which in this context means the bona fide investigation of a separate crime. The proof showed that six days after Schwimmer’s arrest, the police were approached by confidential informant No. 7000 (Cl) who told them the following tale: several months earlier the Cl had been approached by one "Leon” in a Brooklyn cafeteria who proposed to finger a Brooklyn rabbi while acting as a courier of $500,000; in return Leon would divide the loot with the robber. The undercover police team, of which Coll was a member, decided to go forward with Schwimmer in a fake robbery of the Brooklyn rabbi.
It is defendant’s contention that this "new” investigation was a sham simply contrived to shore up what was still a flimsy New York complaint. In support of that claim, defendant points out that no tape recording was made of a brief initial meeting on September 28, at which the Cl introduced Coll in his underworld guise to Schwimmer, and to the additional fact that all police reports of the meeting have been lost. Defendant speculates that Coil’s testimony with respect to the innocuous character of this first meeting may well be false, and this absence of corroboration tarnishes good faith.
There is much to rebut defendant’s surmise of bad faith. Although the incident contained in the Cl’s report of the Brooklyn rabbi plot may have been six months old, the media were then ablaze with the mysterious disappearance of another diamond courier, Pincus Joralowich, who subsequently was found to have been murdered. The Cl believed and told the police that his "Leon” might have been involved with that crime — an item of information which would have galvanized any normal police organization into concerted action. Most important in demonstrating good faith is the content of the tape itself. Coll and the Cl clearly press for the Brooklyn rabbi "job” or any other job which will be productive of money. They never make the slightest reference to other crimes in which defendant may have been involved. It is defendant himself who voluntarily intrudes the subject of the West 4th *984 Street subway robbery in a manner which could not reasonably have been anticipated by the undercover investigators.
On the record made at the hearing, the court finds that a clear preponderance of the credible evidence establishes that the police were pursuing an independent investigation of Schwimmer in good faith. These findings necessarily raise two important questions: (1) What is the burden of proof here? (2) Which party should bear that burden?
Defendant has asserted that the People must establish all factual aspects of admissibility here beyond a reasonable doubt. The People simply do not address the subject. Yet this court must conclude that defendant’s assumption is erroneous.
It is, of course, true that where a confession is contended to be the product of custodial coercion by the police, the People have the burden, in this jurisdiction, to prove voluntariness of the confession or admissions beyond a reasonable doubt (People v Huntley, 15 NY2d 72; People v Leonti, 18 NY2d 384; People v Valerius, 31 NY2d 51).
In each of the foregoing cases, the defendant’s damaging statements were the result of physical abuse, fatigue, and/or duress. Because of society’s overwhelming revulsion against third degree methods, it is altogether proper to insist that direct police custodial interrogation of a person accused of crime meet the highest standards. A coerced confession makes a mockery of justice, and is evidence of nothing at all.
In this case, there is no issue whatever as to the voluntary character of Schwimmer’s statements. They are not the outcome of coercion, but rather the result of all too eager braggadocio. Reference to their voluntary or nonvoluntary character is utterly beside the point.
Since the issue appears open in New York, this court is free to hold that logic compels the adoption of a different burden of proof. Proper judicial control of undercover techniques, designed to lull a criminally minded person into a false sense of security, is on no higher plane, surely, than the fixation of constitutional limits on the police power to eavesdrop, or to search premises and persons. Significantly, even where a claim of custodial coercion of a confession is raised, the States are constitutionally free to adopt a rule that the prosecutor must prove voluntariness by mere preponderance of the evidence (Lego v Twomey, 404 US 477). New York, for the wisest of policy reasons, has opted for a higher prosecutor’s burden *985 in this context. However, that heavy burden should not be pushed beyond its reasonable application.
The Fourth Amendment right to be secure from unreasonable search and seizure surely stands no higher than the right to be secure with respect to conversations which have a criminal object in view. In objecting to surreptitious police use of electronic devices (a view rejected by the court), Justice Brennan nonetheless significantly noted in dissent: "The risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak.” (Lopez v United States, 373 US 427, 465, reh den 375 US 870; emphasis added.)
Interception of telephone conversations have been analyzed in terms of the Fourth Amendment rather than the First Amendment (Katz v United States, 389 US 347; Kaiser v New York, 394 US 280; see, also, Olmstead v United States, 277 US 438). Likewise, telephone conversations from jail of an indicted incarcerated defendant have been intercepted and received in evidence for their inculpatory character (United States v Hearst, 563 F2d 1331). The evidentiary matter here is analogous to the interception of any communication by an eavesdropper and is to be viewed on that basis rather than as the coercion of a confession.
It is well settled that where a defendant seeks to suppress evidence on the ground of illegal seizure, the burden of persuasion lies upon the defendant (People v Berrios, 28 NY2d 361; People v Lombardi, 18 AD2d 177). Accordingly, the court holds that in attacking the good faith of the officers in pursuing an independent investigation, defendant should fare no better than one who seeks to suppress any other kind of illegally seized evidence. Although the People have the burden of going forward in the first instance (a burden which the People have assumed here), it is in the final analysis the defendant who has the burden of demonstrating that the evidence was illegally obtained. Indeed, it was in the context of a search and seizure case that the Supreme Court of the United States in Hoffa v United States (385 US 293, 302) stated: "Neither this Court nor any member of it has ever expressed the view that the Fourth Amendment protects a wrongdoer’s misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it.”
*986 Citing that passage, the Second Circuit Court of Appeals said in Wilson v Henderson (584 F2d 1185, 1191): "Nor can such a shield be found in the Sixth Amendment.” (The reference being to the absence of defendant’s counsel, also an issue here.)
In recasting the adversaries before it in light of this revised burden of proof, the court concludes that defendant has failed to prove any lack of police good faith in this investigation, good faith being simply defined as to whether the police were conducting a genuine investigation into defendant’s potential involvement in unrelated serious crimes.
Defendant’s final argument against admissibility of the tape recording is his most sweeping. He urges that the Constitution bars any evidence surreptitiously obtained by the police from a defendant once he has been charged with a crime and has engaged defense counsel.
In Massiah v United States (377 US 201), decided by the United States Supreme Court in 1964, and in several cases which followed it, considerable support can be found for this view. Massiah involved the use by police of a turncoat accomplice who obtained incriminating statements. Of course the police were seeking evidence on the very charge for which defendant was indicted. The Supreme Court excluded this evidence. This exclusionary rule underwent considerable expansion in subsequent cases (Lyles v Beto, 379 US 648; McLeod v Ohio, 381 US 356; Beatty v United States, 389 US 45). Several Circuit Courts other than ours accepted what appeared to be a totally antiseptic exclusionary approach (Hancock v White, 378 F2d 479 [CCA 1st]; Pryor v Henderson, 403 F2d 46 [CCA 6th]; United States ex rel. O’Connor v New Jersey, 405 F2d 632 [CCA 3d]).
A shift in approach clearly emerges in Hoffa v United States (385 US 293, supra) and in United States v Missler (414 F2d 1293 [CCA 4th]). In those cases, the respective courts held that the mere pendency of an indictment does not serve to immunize a defendant from accountability for statements made in the commission of another crime even if those statements are procured by a government informer or otherwise legal eavesdropping. True, these decisions involved the use of the statements in prosecution of defendant for the second crime and not in connection with the indicted crime. This latter problem was squarely faced in Grieco v Meachum (533 F2d 713, supra). In Grieco, defendant Cassesso was 1 of 6 *987 indicted for murder. While defendant was incarcerated and pending trial, a go-between named Ventola offered a $50,000 bribe to a lifer named Glavin to confess to participation in the murder in place of Cassesso. Glavin reported Ventola’s bribe offer to the FBI who told him to go along with the plot and discuss it with Cassesso. Cassesso implicated himself in the murder in subsequent talks with Glavin, and Glavin’s testimony was admitted against Cassesso in his State court trial. The First Circuit held that this was proper since the FBI was clearly investigating another crime, namely, subornation of perjury.
Decisions in our Second Circuit have followed the same course. This circuit has drawn the distinction between postarraignment and postindictment statements — a distinction applicable here — and refused to require suppression of statements made by defendant to officers aware of the investigation but not the indictment (United States v Hinton, 543 F2d 1002, 1016). Recently the same court was called upon to review the full ambit of Massiah in Wilson v Henderson (584 F2d 1185, supra), and it reaffirmed and expanded the position taken by it a decade ago in United States v Garcia (377 F2d 321). In Wilson, the defendant, charged with robbery and murder of a taxicab dispatcher committed with two confederates still at large, had been arrested and interrogated by a Detective Cullen. The interrogation ended when defendant admitted his presence as a witness at the scene of the shooting and his subsequent flight based solely on fright.
Prior to the conclusion of this interview, the detective had "planted” an informant named Benny Lee in the cell where defendant was to be lodged. Lee had been carefully instructed not to ask any questions, but to keep his ears open in the hope that the identity and whereabouts of the two missing accomplices could be ascertained.
Shortly thereafter, defendant repeated the same account of the incident to Lee, whose only comment was that "this story doesn’t sound too good.” Lee’s lackluster appraisal was followed two days later by defendant’s complete confession of his involvement in the murder, all of which was offered and received on the trial.
Obviously, in Wilson there was full knowledge by Detective Cullen of the crime since he was the investigating officer. Yet this knowledge did not require exclusion of the confession because the main objective of the police stratagem was not *988 further interrogation of (or the obtaining of incriminating evidence from) defendant; the dominant purpose was to continue the investigation in order to apprehend others guilty of the crime.
It thus appears that from a constitutional standpoint, so long as the police have an independent and legitimate law enforcement objective articulately severable from the development of further evidence against the defendant, the fact that such further evidence emerges as a by-product does not automatically exclude its use. The admissibility of the by-product will turn upon the good faith and legitimacy of the separate police objective, to be determined on a case-by-case analysis. In this case the manner in which the police obtained the evidence meets current constitutional standards.
For the foregoing reasons, defendant’s motion to suppress the tape recording of the October 18, 1977 conversation between himself, Officer Coll, and the Cl is in all respects denied.