OPINION OF THE COURT
Irving Lang, J.
To the plethora of pretrial motions and proceedings which have characterized the criminal law revolution of the 1960’s and 1970’s, a new mutation has been spawned, the Massiah-Hobson hearing.
The issue to be determined is whether to exclude from evidence surreptitiously recorded statements of the defendant made after he had been arrested in New York, retained counsel and was released on bail. The statements were recorded when defendant telephoned an alleged accomplice who, unbeknownst to him, was acting as a police informant for the purpose of participating in a stakeout designed to snare two other accomplices. At the time the defendant was in custody in New Jersey as a parole violator, partially as a result of the New York arrest.
*296 A subsidiary issue is the admissibility of an exchange of written correspondence between the defendant and the informant at later occasions when both were in custody.
The defendant claims that the statements and letters were obtained in violation of his constitutional right to counsel and his privilege against self incrimination as enunciated by the Supreme Court of the United States in Massiah v United States (377 US 201) and the New York Court of Appeals in People v Hobson (39 NY2d 479).
THE FACTS
It is perhaps ironic that this web of intrigue should have its genesis in a confidence game. In February of 1978 a 65-year-old widow was bilked of almost her entire life savings of over $50,000 in a classic "pocketbook drop” swindle by two women who purportedly found a large sum of money and offered to let the victim share in the proceeds by putting up "good faith” money.
On March 1, 1978, Randy Brodsky and Elsie "the Señorita” Perez were indicted by a New York County Grand Jury after a photographic identification by the victim, who went to the police after realizing that she had been duped.
On March 15, 1978, Brodsky was arrested in Queens County on an unrelated charge and subsequently arraigned and remanded on the New York County indictment. Brodsky then offered to co-operate and the Grand Jury investigation was reopened on March 28, 1978. Testifying under waiver of immunity, Brodsky implicated Perez, the defendant, and Thomas Tisdale "Fast Black,” defendant’s confederates who "played the phone” (pretended to be a lawyer) and who received the proceeds of the theft.[1]
While the Grand Jury continued its investigation, a complaint and arrest warrant was issued for the defendant, who was arrested on April 10, 1978, arraigned, retained counsel and was released on bail.
Perez and Tisdale (the "Señorita” and "Fast Black”) remained unapprehended.
Brodsky continued to co-operate with the authorities and on *297 June 8, 1978 she was released from prison to participate in a stakeout. The stakeout had four objectives:
(1) to use Brodsky as bait to apprehend Tisdale;
(2) to use Brodsky as bait to apprehend Perez;
(3) to record conversation between Brodsky and Tisdale about the $50,000 con;[2]
(4) to participate in new cons with Perez and/or Tisdale (Conscam).
To accomplish these ends it was decided that Brodsky would contact a man named Robert Navarro, described as "a go-between for people in the life-con games, prostitution”. Brodsky would give Navarro the hotel and telephone number where she could be reached and would tell Navarro that the number should be given only to Fast and Elsie.
Brodsky carried out her instructions with Navarro and was installed in a room at the Statler Hilton Hotel to await contact with "Fast” and/or Elsie. The police were in an adjoining room and the phones were tapped and taped.
No mention of defendant Leroy Brooks was made during the preparations, since it was known that Brooks was being held in Camden County, New Jersey, on parole violation, at least in part because of the instant case.
On June 10, 1979, at 10:35 a.m., Brodsky received her first telephone call, not from "Fast,” not from the "Señorita,” but from defendant Brooks in the Camden County jail. Whether Brooks found out Brodsky’s location directly or indirectly from Navarro is unknown, but it does reflect the amazing communication system among denizens of the demimonde.
In that first conversation Brooks accused a surprised Brodsky of testifying against him and, upon Brodsky’s vehement denial, indicated that he would call her again and have Elsie contact her. Apparently Brooks, in jail, had no problem contacting Elsie, who for months had been (and still is) the object of an intensive police search, for Elsie called Brodsky shortly after Brooks hung up.
Meanwhile, the officers monitoring the telephones panicked. With obvious concern that listening to the Brooks call would *298 result in yet another appellate flagellation of law enforcement techniques, the District Attorney’s office was immediately called and told of the unforeseen event. The bureau chief handling the investigation told the officers to direct Brodsky not to ask Brooks any questions, not to encourage Brooks to talk, not to try to gather any evidence, but rather to listen, act naturally, answer any questions and to be careful not to blow the stakeout. In effect, Brodsky was to protect her cover but do nothing else.
The defendant subsequently called twice. They again discussed the rumors about Brodsky, which she denied. She described the evidence the police had against him, and promised that she would testify that he had not been involved in the scheme. At the hearing before this court Brodsky testified that whatever conversations she had about the case were prompted by Brooks’ suspicions and that she was trying to protect herself and convince Brooks that she was not the informant.
On June 10, 1978, the stakeout operation was closed and Brodsky was returned to jail. She eventually pleaded guilty and was sentenced to State prison. The sentence encompassed a number of cases.
While in jail Brodsky received four letters from the defendant and responded to them all via a method which indicates that the United States Postal Service does not have a monopoly on interpenal correspondence. The letters were smuggled in and out of prison through intermediaries. She ultimately turned over Brooks’ letters to the police.
THE LAW
In Massiah v United States (377 US 201) the defendant, after indictment on a narcotics charge, retained counsel, pleaded not guilty and was released on bail. While free on bail he made incriminating statements to a codefendant who became a government informant. As in the instant case, the conversations were recorded. The Supreme Court of the United States reversed the conviction holding that admitting the recorded statements of the defendant in evidence violated his Sixth Amendment guarantee of the right to counsel. "We hold that the petitioner was denied the basic protections of that guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted *299 and in the absence of his counsel.” (Massiah v United States, 377 US 201, 206, supra.)
In People v Hobson (39 NY2d 479) the New York Court of Appeals reversed a conviction where a defendant had "waived” counsel and made incriminating statements to the police.
"Once a lawyer has entered a criminal proceeding representing a defendant in connection with criminal charges under investigation, the defendant in custody may not waive his right to counsel in the absence of his lawyer (People v Arthur, 22 NY2d 325, 329). Any statements elicited by an agent of the State, however subtly, after a purported 'waiver’ obtained without the presence or assistance of counsel, are inadmissible.” (People v Hobson, 39 NY2d 479, 481, supra.)
The defendant contends that his rights were violated under both Massiah and Hobson.
While Massiah and Hobson are often cited in the same case (cf. People v Clark, 41 NY2d 612, 614, 615), and indeed Hobson (39 NY2d 479, 483, supra) refers to Massiah, the interrelationship between these two landmark decisions has not been subject to in-depth analysis.
Both the Massiah and Hobson courts held that the defendants’ Fifth and Sixth Amendment rights were violated. Massiah (supra) specifically relied on two New York cases — Spano v New York (360 US 315) and People v Waterman (9 NY2d 561) — which condemned police interrogation in the absence of counsel. Hobson (supra) relied on Spano (supra) and such cases as People v Donovan (13 NY2d 148) and People v Arthur (22 NY2d 325) which, in turn, relied on Waterman (supra) to reverse convictions based on confessions made in the absence of counsel.
However, while both the Hobson and Massiah courts employed the same general philosophical and constitutional props and analogized their holding to the same line of cases, there is a fundamental factual distinction between Hobson and Massiah situations which, in my view, mandates that these similar cases be treated differently.
All Hobson cases, both its predecessors and progeny, involve statements made to a law enforcement officer by a defendant who is fully aware that he is speaking to a law enforcement officer. There is no deception as to the identity of the parties. On the other hand, all Massiah cases relate to situations *300 where the defendant is unaware that he is speaking to a law enforcement officer or agent.
Thus the rationale of Hobson (39 NY2d 479, supra) is that a defendant without counsel in a custodial setting is no match for the police interrogator. "[T]he presence of an attorney is the most effective means * * * of minimizing the disadvantage at which an accused is placed when he is directly confronted with the awesome law enforcement machinery possessed by the State”. (People v Cunningham, 49 NY2d 203, 207.) In balancing the rights of the government to solve crimes against the rights of the defendant against self incrimination and the assistance of counsel, the Court of Appeals has set certain guidelines and lines beyond which the investigation may not encroach.
(1) A defendant in custody after an accusatory instrument has been filed is entitled to counsel and may not be interrogated or waive counsel in the absence of counsel. It does not matter whether the accusatory instrument is a complaint (People v Samuels, 49 NY2d 218) or an indictment (People v Waterman, 9 NY2d 561, supra; People v Settles, 46 NY2d 154).
(2) Even if the defendant initiated the conversation, the statement will be suppressed if the questioning elicited incriminating material from the defendant in custody (People v Townes, 41 NY2d 97; cf. People v Roberson, 41 NY2d 106).
(3) In the investigation or arrest stage a defendant in custody who has counsel cannot waive his right to counsel. Nor can he be denied access to counsel (People v Donovan, 13 NY2d 148, supra; People v Bevilacqua, 45 NY2d 508; People v Tompkins, 45 NY2d 748).
(4) In the investigation or arrest stage, a defendant in custody may not be questioned without counsel once he requests counsel, even if he changes his mind (People v Grant, 45 NY2d 366; People v Cunningham, supra).
(5) The only exceptions to these rulings are "spontaneous” admissions or statements (People v Kaye, 25 NY2d 139; People v Roucchio, 70 AD2d 322). However, the courts will carefully scrutinize such custodial statements to determine that they are truly spontaneous, rather than induced spontaneity (People v Rogers, 48 NY2d 167).
Illustrative of the fine distinctions drawn by the Court of Appeals is the case of People v McKie (25 NY2d 19). In that *301 case, cited with approval in Hobson (39 NY2d 479, supra), the defendant was a suspect in a murder. Although he had not been arrested, he retained a lawyer, who in turn had told the police several times not to question his client. The police continued to follow the defendant and on one occasion the defendant approached the detective’s car complaining, "When are you guys going to stop bugging me?” A verbal duel ensued during which a defendant told McKie, "You seem to be so brave now; you weren’t so brave when you killed that little old lady,” to which McKie replied, "Sure I did it, but you guys can’t prove it.”
Using the statement, the "guys” proved it. The Court of Appeals affirmed, holding that since the defendant was not in custody or physically deprived of his freedom in any way, the volunteered statement was admissible.
Thus it is clear that Hobson (supra) is triggered by two congruent requirements. First, the defendant must be in a custodial setting. Second, he must know that he is talking to a law enforcement officer. It is this knowledge in that setting which per se creates such a coercive atmosphere that our highest court will not permit the defendant to waive his constitutional rights and incriminate himself without counsel.
It is manifest, therefore, that the Hobson line of cases has no true relationship to the instant case for an essential element for invoking Hobson is missing, namely, knowledge that the interrogator is a law enforcement officer and the coercive atmosphere that inevitably accompanies such knowledge.
The defendant, therefore, has no choice under Hobson (supra). His only possible salvation is Massiah (377 US 201, supra).
MASSIAH
While Hobson (supra) involves the overt power of the State against the individual, Massiah -(377 US 201, supra) relates to a surreptitious attempt to have the defendant incriminate himself. Unlike Hobson (39 NY2d 479) where a custodial atmosphere purportedly induces the defendant’s compulsion to confess to his police interrogators, in Massiah (supra) self incrimination is induced by the deceptive practices of the State.
The two basic ingredients of Hobson (supra) are custody and *302 knowledge. The two basic ingredients of Massiah (supra) are agency and objective. In order to constitute a Massiah violation it must be established that the statement sought to be suppressed was made to an individual acting as an agent of law enforcement officials and, further, that the prime objective of the agent was to elicit incriminating statements by the defendant in violation of his constitutional rights.[3]
AGENCY
As indicated, a Massiah violation (377 US 201, supra) occurs only when the statement is made to an informant acting at the behest of the government. In Paroutian v United States (370 F2d 631) the appellant made incriminating statements to a cellmate who testified for the prosecution. The Federal Court of Appeals rejected a claim under Massiah (supra), holding that it was clear that the cellmate was not a government agent at the time the admissions were made. "We are certain that in deciding Massiah, the Supreme Court did not intend to hold that all those to whom indicted persons make admissions become ipso facto government agents” (Paroutian. v United States, supra, p 632).
To the same effect see United States ex rel. Milani v Pate (425 F2d 6, cert den 400 US 867).
The New York Court of Appeals confronted this issue in People v Cardona (41 NY2d 333). In that case an inmate-witness had on a number of occasions volunteered information to the District Attorney’s office, including two unsolicited conversations with the defendant. In upholding the finding of the trial court that the informant had not been coached or instructed by the police and prosecutors, the Court of Appeals *303 stated (p 335): "That the informer has a self-interest in obtaining better treatment from the government does not thereby automatically make the informer an agent of the government. The motivation to inform comes from the informer and not from the government. To be sure, if the government affirmatively plays on that motivation or harkens the informer to his self-interest, it thereby runs the risk of being responsible and accountable for the informer’s actions. But mere acceptance of proffered information by the government does not by itself necessarily establish the existence of an agency relationship between government and informer.”
The prosecution contends that the informant in the instant case was not their agent as to the defendant Brooks. The claim is that Randy Brodsky was released on bail to act as their agent only as to Tisdale and Perez, "Fast Black” and the "Señorita.” No preliminary discussions related to Brooks. The directions to the go-between Navarro were for him to give Brodsky’s hotel number only to Tisdale and Perez. Therefore, claims the prosecution, since there was no anticipation or plan for defendant Brooks to be involved in the stakeout, Brodsky cannot be considered an agent as to Brooks.
While this argument has some surface appeal, it must be rejected on both factual and policy grounds. While there is no question that Brooks’ involvement in the stakeout was not foreseen or expected, there is also no question that Brodsky was an agent of the prosecution with respect to the entire case. She had testified against Brooks in the Grand Jury. She continued to co-operate with the authorities after her testimony. It was understood that she would testify against Brooks at trial. Thus, while her specific mission did not involve Brooks, she was still a government agent in relation to the entire case, including Brooks.
The use of informers, many of whom are accomplices or career criminals, is too tricky a business to have the courts make the subtle distinction suggested by the District Attorney. Fraught with self-interest, an informant’s testimony and activities should not be easily switched in and out of an agency relationship (cf. People v Cona, 49 NY2d 26, testimony of accomplice may not be artifically divided into pre- and post-time of becoming accomplice to avoid corroboration rule). I hold, therefore, that Randy Brodsky was a government agent within the context of Massiah (377 US 201, supra).
*304 OBJECTIVE
The final test under Massiah (supra) is the objective of the deceptive enterprise.
If the primary object of the use of a government informer is to obtain evidence against a defendant against whom a formal charge is pending, the statements obtained through the actions of the informer will be suppressed under Massiah (supra). For example, in People v Hines (69 AD2d 23) the Appellate Division analyzed the following fact pattern. A victim of a crime came to the station house and told a detective that the defendant had told the victim in a telephone conversation that he was sorry for his actions. The victim then called the defendant from the station house, with the detective monitoring the conversation, during which the defendant repeated the admission. Reversing the conviction, the court held that the monitored conversation was clearly inadmissible under Massiah (377 US 201, supra).
On the other hand, Massiah is not the emancipation proclamation for the criminal who believes that, once charged and assigned counsel, he is free to pursue additional unlawful activities free from police interference or investigation. If the police have a legitimate objective, such as investigating other crimes or apprehending accomplices, Massiah will not save the defendant. (Wilson v Henderson, 584 F2d 1185 [informant placed in defendant’s cell to listen for identity of defendant’s confederates]; Grieco Meachum, 533 F2d 713 [good faith acquisition through informer of information concerning attempted subornation of perjury by defendant held not to violate Massiah].)
New York courts have distinguished cases where statements were elicited in the course of a good-faith investigation from cases where the object of the continuing investigation was to deliberately elicit incriminating statements and have refused to exclude the former from evidence (People v Clark, 41 NY2d 612; People v Schwimmer, 99 Misc 2d 980). As was so aptly stated in Schwimmer (supra, p 988), where the police "have an independent and legitimate law enforcement objective articulately severable from the development of further evidence against the defendant, the fact that such further evidence emerges as a by-product does not automatically exclude its use. The admissibility of the by-product will turn upon the good faith and legitimacy of the separate police objective, to be determined on a case-by-case analysis”. Where the police *305 are investigating an attempt to commit a second crime by the defendant, incriminating statements made by the defendant regarding the first crime are admissible (People v Clark, supra).
Courts must, of course, be ever vigilant to assure that the use of such undercover tactics is undertaken in good faith and is not a mere ruse designed to develop evidence in a case which has reached the adversary stage (cf. Beatty v United States, 389 US 45).
With respect to the instant case there can be no question as to the legitimate good-faith nature of the initial stakeout and the subsequent actions of the police and prosecutors. Brooks was neither a target nor a part of the operation. His involvement was purely on his own initiative. When he accused the informant of being an informant, she was placed in a threatening and potentially dangerous situation. The instructions given to her by the District Attorney were appropriate and were followed appropriately. That every response by Brodsky was not merely passive and that some of her statements might have elicited incriminating material is inevitable in this type of situation and consistent with maintaining her cover. That the accused con man was duped may be unfortunate from his point of view, but was not unconstitutional.
The motion to suppress the recorded statements is denied.
The motion with respect to the exchange of letters, however, is different. The stakeout operation had long ended. The agent, no longer in danger, was in jail. There was no need to respond to the initial letter. The fact that for whatever motivation she may have had she did not turn over the letters to the police till months later, did not make her any the less an agent. She still expected to testify against Brooks. There was no independently legitimate law enforcement purpose in the correspondence. Therefore, all the defendant’s letters to the informant other than the initial letter, which was unsolicited, are suppressed.

. Brodsky testified that "Fast Black” was her "pimp” and the defendant was the "Senorita’s” pimp. In the con game, although prostitution is not involved, the "pimp” of the female con artists, as in prostitution, receives the proceeds.

. As opposed to Perez, who had been indicted, and Brooks, who had been arrested and charged in a complaint, no accusatory instrument had been filed against Tisdale; therefore the right to counsel had not attached and the People could attempt to secure incriminating statements. (See People v Waterman, 9 NY2d 561, no questioning after indictment; People v Samuels, 49 NY2d 218, no questioning after complaint.)

. Unlike the New York courts, Federal courts have no decisions comparable to Hobson (39 NY2d 479, supra). Thus the Supreme Court has treated true Hobson cases as Massiah violations, oblivious to the obvious problems of such a parochial approach. In Brewer v Williams (430 US 387) the Supreme Court reversed a conviction based on an obvious Hobson situation by citing Massiah (377 US 201, supra). In so doing, the court expanded the clear limitation of Massiah to postindictment statements to the commencement of "adversary proceedings.” The court, however, refused to say that a defendant with counsel could not, without notice to counsel, waive his Sixth Amendment rights. The New York Court of Appeals obviously is aware of this more restrictive approach, and consequently has rooted many of its decisions on the State, rather than the Federal, Constitution (see People v Cunningham, 49 NY2d 203, supra).