THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
LEROY BROOKS, Defendant-Appellant.

First Department, November 24, 1981

**APPEARANCES OF COUNSEL**

*Steven G. Eckhaus* for defendant-appellant.

*Debora K. Grobman* of counsel *(Robert M. Pitler* with her
on the brief; *Robert M. Morgenthau, District Attorney,*
attorney), for respondent.

**OPINION OF THE COURT**

LYNCH, J.

The issue for determination was completely stated by the
Justice whose order after a suppression hearing is ap-
pealed: "whether to exclude from evidence surreptitiously
recorded statements of the defendant made after he had
been arrested in New York, retained counsel and was
released on bail. The statements were recorded when de-
fendant telephoned an alleged accomplice who, unbe-
knownst to him, was acting as a police informant for the
purpose of participating in a stakeout designed to snare
two other accomplices. At the time the defendant was in

custody in New Jersey as a parole violator, partially as a result of the New York arrest" *(People v Brooks,* 103 Misc 2d 294, 295); "[a] subsidiary issue is the admissibility of an exchange of written correspondence between the defendant and the informant at later occasions when both were in custody" *(supra,* p 296).

The defendant and Brodsky, Perez, and Tisdale were suspects in a con game that swindled $57,000 from an elderly woman. Brodsky and Perez were indicted after the victim had identified them from photographs. After her arraignment Brodsky agreed to co-operate with the police and, waiving immunity, implicated Perez, Tisdale, and the defendant to the Grand Jury. The latter was arrested, retained counsel, and was released on bail. He was, however, due to this charge, jailed in New Jersey for a parole violation.

Meanwhile, Brodsky was released on bail so that she could participate in a stakeout to locate Perez and Tisdale. She was registered into a hotel room with a tapped telephone and listening devices. Two police officers were in the adjoining room. Brodsky called a go-between, Navarro, telling him to relay her telephone number to Perez and Tisdale. Much to her surprise, her first caller was the defendant, talking from the New Jersey jail.

The defendant told Brodsky where he was and that the police were claiming that they were going to send him back to prison because she was going to be a witness against him. Her denial of this came in the form of a barnyard expletive and she asked the defendant to have Perez and Tisdale get in touch with her.

The defendant, believing Brodsky's denial that she was a witness against him, called twice more and later wrote four letters to her, the first three of which she answered.

At the hearing to suppress the letters and the tapes of the telephone calls, Brodsky, a police officer, and an Assistant District Attorney described the nature and purpose of the stakeout, their reaction to the defendant's first call and their plan for dealing with subsequent ones, i.e., Brodsky was instructed not to try to get any information from the defendant but only to talk to him and answer his questions.

The police officer testified that the main objective after the first call was to avoid aborting the stakeout. He admitted that he realized that "there could possibly be a problem later on. Mr. Brooks had been arrested on this matter and had an attorney. By her talking to him, there could be a legal problem later on". He stated that the defendant, Brooks, was not an object of the stakeout because he did not think Brooks would be able to telephone from jail.

The Assistant District Attorney confirmed the instructions to Brodsky, but he admitted that, in telling Brodsky to talk to the defendant, he was "trying to get some statements on the phone from Mr. Brooks that may be incriminating". On cross-examination he stated that he felt that Leroy Brooks was the main culprit in this, the guiding force, and that, as part of his job, his "concern was to try to implicate him the best [he] could".

The hearing court denied suppression of the tapes of the telephone calls and the defendant's first letter to Brodsky. It ordered suppression of the remaining three letters.

On appeal, as on the suppression hearing, the defendant's argument for suppression lies under those State and Federal constitutional provisions guaranteeing his right to counsel. He specifically invokes *People v Hobson* (39 NY2d 479) and *Massiah v United States* (377 US 201) and the progeny of those cases.

The suppression court found that the protection afforded by *Hobson* "is triggered by two congruent requirements. First, the defendant must be in a custodial setting. Second, he must *know* that he is talking to a law enforcement officer". *(People v Brooks,* 103 Misc 2d 294, 301, *supra.)* The suppression court then found the *Hobson* line of cases inapplicable because the defendant did not know that Brodsky was an agent of the police.

With laudable candor, the People, responding to this appeal, have acknowledged that, as to the hearing court's interpretation of *Hobson,* "[i]t is not altogether clear that the court below is correct". We find that it is not correct. A custodial setting is not essential to protection under *Hobson (People v Skinner,* 52 NY2d 24; *People v Roberson,* 41 NY2d 106; *People v Townes,* 41 NY2d 97). Nor is it essen-

tial that the defendant be aware that he is talking to a police officer or his agent. In *People v Townes (supra)* a defendant's conversation with a representative of the New York City Civilian Complaint Review Board, who was a police officer in street clothes, was suppressed. In *People v Grimaldi* (52 NY2d 611) the defendant's conversation with his father, overheard by a police officer out of the defendant's view, was suppressed.

The *Hobson* decision itself derives from a long line of cases enforcing our State constitutional guarantee to the right to the aid of counsel and proscribing waiver of that right in the absence of counsel. *People v Waterman* (9 NY2d 561, 565) stated broadly, "[a]ny secret interrogation of the defendant, from and after the finding of the indictment, without the protection afforded by the presence of counsel, contravenes the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with crime". This principle was restated in *People v Arthur* (22 NY2d 325, 329): "Once an attorney enters the proceeding, the police may not question the defendant in the absence of counsel unless there is an affirmative waiver, in the presence of the attorney, of the defendant's right to counsel". This was confirmed verbatim by *Hobson (supra,* p 481) and made applicable to "[a]ny statements elicited by an agent of the State, however subtly, after a purported 'waiver' obtained without the presence or assistance of counsel".

*Hobson* carves out a narrow exception for statements spontaneously made, one not applicable here. All of the defendant's statements and correspondence, once he had identified himself and his location, came after Brodsky's false assurance to him that she was not a witness against him. "[T]he spontaneity has to be genuine and not the result of inducement, provocation, encouragement or acquiescence, no matter how subtly employed" *(People v Maerling,* 46 NY2d 289, 302-303).

We conclude that, under our State constitutional guarantee, the tapes of the telephone calls and all of the letters should be suppressed.

Suppression should also have been granted under the Federal constitutional protection set forth in the *Massiah* line of cases. The suppression court ruled that the protection of *Massiah (supra)* is available only when the eliciting of information from the defendant is the primary objective of the use of the police informant. It concluded that this defendant was not a primary objective of the police stakeout. We find this to be an untenable conclusion. Once the defendant called and was deluded by Brodsky's false assurance that she was not a witness for the police, he became a primary objective. The police officer admitted that Brooks was not an objective of the plan for the stakeout because he did not think that Brooks would be able to call from jail. The Assistant District Attorney admitted that, after the first call, in telling Brodsky to continue talking to the defendant should he call again, he was trying to get incriminatory evidence from him.

Even so, we find that the *Massiah* protection does not turn on such a formality as the primacy of the objective of the police informant. Rather, it is triggered when the incriminating conversations between the defendant and the informant have been facilitated by the informant's "conduct and apparent status as a person sharing a common plight" *(United States v Henry,* 447 US 264, 274).

Judgment, Supreme Court, New York County (LANG, J., at hearing, plea, and sentence), rendered May 22, 1980, convicting defendant of grand larceny in the second degree and sentencing him to a term of 2 to 4 years (his right to this appeal having been specifically preserved for him by the court), is reversed, on the law and the facts, the plea and sentence vacated, the motion to suppress granted and the matter remanded for further proceedings. The respondent's motion for permission to file an additional brief is granted, the brief having been considered on this appeal.

SULLIVAN, J. P., and ROSS, J., concur with LYNCH, J.; LUPIANO, J., would affirm on the well-reasoned opinion of LANG, J. (103 Misc 2d 294).

Judgment, Supreme court, New York County, rendered on May 22, 1980, reversed, on the law and the facts, the

plea and sentence vacated, the motion to suppress granted and the matter remanded for further proceedings.