No. 81-570

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

STATE OF MONTANA,

Plaintiff and Respondent,

vs.

WILLIAM NORGAARD,

Defendant and Appellant.

Appeal from: District Court of the Fifteenth Judicial District,
In and for the County of Roosevelt
Honorable M. James Sorte, Judge presiding

Counsel of Record:

For Appellant:

Francis J. McCarvel argued, Glasgow, Montana
Steven R. Marks argued, Glasgow, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Mike McGrath, Assistant Attorney General, argued,
Helena, Montana
Marc F. Racicot argued, County Prosecutors Service
Bureau, Helena, Montana
James A. McCann, County Attorney, argued, Wolf Point,
Montana

Submitted:  June 23, 1982

Decided:  November 4, 1982

Filed: NOV 4 1982

*Thomas J. Kearney*

Clerk

Mr. Justice Frank B. Morrison, Jr., delivered the Opinion of the Court.

Defendant William Allen Norgaard appeals from a verdict and judgment convicting him of three counts of deliberate homicide. Three issues are presented on appeal:

(1) Whether the District Court erred in refusing to suppress statements made by defendant to a criminal investigator during an interview conducted without counsel and after filing of an information?

(2) Whether the District Court erred in excluding as hearsay a statement victim Stanley Nees made to witness Howard Kelsey regarding the threat against Nees' life?

(3) Whether the District Court erred in refusing defendant's proposed instructions regarding mitigated deliberate homicide?

On February 25, 1981, Stanley Nees, Leota Hoye and Mildred Geer were shot to death in Poplar, Montana. William Norgaard was arrested and charged with three counts of deliberate homicide on March 4, 1981, after a lab report confirmed that shells found at the scene of the crime and shells found in the Norgaard home were fired from the same rifle. Norgaard was arraigned by the District Court judge in the Trinity Hospital in Wolf Point, Montana, where Norgaard was being treated for colitis and observed for suicidal tendencies.

On March 7, 1981, Norgaard was taken to Missoula, Montana, where he was admitted to St. Patrick's Hospital for medical and psychiatric evaluation. Dr. Will Stratford assisted with defendant's admission and treatment.

On March 11, 1981, Dr. Stratford inquired of Special Prosecutor Marc Racicot as to whether a psychiatric evalu-

ation was to be ordered for Norgaard and whether defense counsel had been appointed on Norgaard's behalf. Stratford was concerned about appointment of counsel because Norgaard was becoming more talkative to hospital personnel. Racicot informed Dr. Stratford that on the previous day the District Court had appointed Francis McCarvel defense counsel and that McCarvel had immediately requested a court-ordered psychiatric evaluation of Norgaard. The District Court ordered the evaluation on March 11, but Stratford had not yet received a copy of the order.

Following Stratford's call, Racicot telephoned State Criminal Investigation Bureau agent Gary Carrell. Agent Carrell was assisting Roosevelt County law enforcement authorities in the investigation of the triple homicide and had previously interviewed Norgaard on March 3-4, 1981, in Wolf Point, regarding any information Norgaard might have concerning the crimes.

Agent Carrell then met with Racicot in Racicot's Helena office. Racicot informed Agent Carrell that Dr. Stratford thought Norgaard was becoming more vocal. Racicot and Agent Carrell discussed whether Carrell should go to Missoula and interview defendant without presence of or notice to defense counsel. Racicot told Agent Carrell that the Roosevelt County Attorney's policy was not to interview defendants without first contacting defense counsel, that some states do not allow such interviews, and that Montana had not decided the question of the propriety of interrogations in absence of counsel. Agent Carrell was left to decide whether or not he should interview Norgaard.

Agent Carrell chose to interview Norgaard without informing defense counsel of his decision. Carrell arrived

in Missoula around 8:00 p.m., March 11, 1981. Carrell called Dr. Stratford and inquired if defendant's physical and mental health could withstand questioning. Dr. Stratford responded that Norgaard's condition would not be impaired by such an interview.

Carrell went to the hospital that night and attempted to interview defendant. Carrell advised defendant of his Miranda rights and told Norgaard that McCarvel had been appointed as his defense counsel. Carrell specifically told Norgaard that he had a right to have his attorney present during any interview or to consult with his attorney prior to an interview. When asked whether he understood what Carrell had said, Norgaard nodded. Norgaard then responded to questions asked by Agent Carrell. During this interview, Carrell elicited from Norgaard that he remembered picking up the shell casings in Leota Hoyes' apartment and that he was upset with Stanley Nees because defendant's father was having financial problems. Nees was a local banker. As Carrell left Norgaard's hospital room that evening, he explained he would return the next morning to continue their discussion of the slayings.

Norgaard was more responsive the following morning. After Carrell had again advised him of his rights and explained that McCarvel had been appointed to represent defendant, defendant stated he understood and proceeded to answer Carrell's questions. During this interview, Norgaard supplied Carrell with information which led to the discovery of the murder weapon.

On August 17, 1981, a pretrial suppression hearing was held regarding the admissions made by Norgaard during the March 11 and 12 interviews. Dr. Stratford testified that

defendant was mentally capable of waiving his rights and that he could make voluntary and intelligent choices while in St. Patrick's Hospital. Agent Carrell testified as to the circumstances and content of the interviews. The only record of the interviews was Carrell's handwritten notes. The defendant did not testify.

The District Court denied defendant's motion to suppress, finding that the State had sustained its burden of proving that defendant made an effective waiver of his rights, albeit without consultation from defense counsel.

At trial Agent Carrell testified about the March 11 and 12 interviews. Howard Kelsey, appearing for defendant, testified that he observed victim Nees and two men (not defendant) in an argument some twelve days before the murders and that Nees was in an excited state after the argument. The trial court would not allow Kelsey to testify that approximately one hour after the argument occurred Nees told Kelsey that the two men had threatened his life. Dr. Stratford did not testify at trial.

The jury found Norgaard guilty of three counts of deliberate homicide. No instructions were given the jury regarding the offense of mitigated deliberate homicide. The Fifteenth Judicial District Court subsequently sentenced Norgaard to three hundred years in the Montana State Prison.

I.

Defendant contends that Agent Carrell impermissibly interfered with his Sixth Amendment right to counsel when he questioned defendant without first notifying defense counsel. Defendant asserts that an effective waiver of the right to counsel cannot be secured unless defense counsel is present when the waiver is given. This argument is based upon the

-5-

New York Court of Appeals' decision in People v. Hobson
(1976), 39 N.Y.2d 468, 384 N.Y.S.2d 419, 348 N.E.2d 894.

Alternatively, defendant contends that Agent Carrell
violated his Sixth Amendment right to counsel when Carrell
proceeded to interview defendant in disregard of the Roose-
velt County Attorney's policy not to interview defendants
without consulting defense counsel.  Defendant believes that
under either a factually-limited or an expansive interpreta-
tion of Brewer v. Williams (1977), 430 U.S. 387, 97 S.Ct.
1232, 51 L.Ed.2d 424, reh. den., 431 U.S. 925, 97 S.Ct.
2200, 53 L.Ed.2d 240, the statements obtained by Carrell
should have been suppressed because they were derived outside
counsel's presence.

In Hobson, supra, defendant was represented by counsel
who had been present during a line-up at which defendant was
identified.  Counsel left after the identification was made.
Knowing that defendant was represented by counsel, and
without notice to counsel, Detective Dolan proceeded to
interview defendant.  An oral waiver of the right to counsel
was secured by Dolan, whereafter defendant confessed to the
robbery under investigation.  Defendant's statements were
used against him at trial.

The New York Court of Appeals reversed defendant's
conviction on the basis that defendant's statements were
obtained in violation of New York's constitutional and
statutory guarantees of the privilege against self-incrimina-
tion, the right to assistance of counsel, and due process of
law.  The New York Court of Appeals held that, "[o]nce a
lawyer has entered a criminal proceeding representing a
defendant in connection with criminal charges under investi-
gation, the defendant in custody may not waive his right to

counsel in the absence of the lawyer." People v. Hobson, 39 N.Y.2d at 483, 384 N.Y.S.2d at 421, 348 N.E.2d at 896. The court explained that the presence of counsel provides a more effective safeguard against involuntary waiver of right to counsel than a mere written or oral warning and that any attempt, by prosecution or law enforcement alike, to secure a waiver of the right of counsel in a criminal proceeding in absence of defense counsel would constitute a breach of professional ethics.

Brewer v. Williams, supra, involved a defendant who turned himself into law enforcement authorities on the advice of his attorney McKnight in Des Moines, Iowa. Defendant was booked in Davenport, Iowa, on an abduction charge that was specified in an outstanding arrest warrant. Defendant was to be transported from Davenport to Des Moines in a police car. Before defendant started his journey, he consulted with an attorney named Kelly in Davenport and telephoned McKnight in Des Moines. Both attorneys advised him not to make any statements until after he personally conferred with McKnight in Des Moines. McKnight and Detective Leaming, a veteran of the Davenport police department, agreed that Williams would not be questioned during his trip to Des Moines. Kelly firmly admonished Detective Leaming to honor his agreement with McKnight. Without counsel Williams set off for Des Moines with Detective Leaming and another police officer. Detective Leaming did not formally interrogate Williams; instead he used what has been referred to as the "Christian burial speech" to induce Williams into disclosing the whereabouts of the young victim's body.

Invoking the rule of Massiah v. United States (1964), 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (violation of

Sixth Amendment found where federal agents deliberately elicited incriminating evidence from defendant after he had been indicted and in absence of his counsel), the United States Supreme Court held that Detective Leaming violated Williams' Sixth Amendment right to counsel. In doing so, the Court acknowledged that even though Williams previously had been informed of and appeared to understand his right to counsel, Detective Leaming neither advised Williams that he had a right to presence of an attorney or made an effort to ascertain whether Williams wished to relinquish that right when he deliberately elicited from defendant incriminating evidence in absence of his counsel. Referring to the Johnson v. Zerbst standard of "an intentional relinquishment or abandonment of a known right or privilege" [(1938), 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466], the Brewer court did not hold that Williams could not, without notice to counsel, waive his rights under the Sixth and Fourteenth Amendments; instead, it specifically stated that the State of Iowa failed to sustain its heavy burden in proving that Williams had intentionally relinquished his right to counsel.

This Court hereby holds that a defendant, charged under information or indictment and represented by counsel, may waive his right to counsel, without notice to or presence of counsel, during an interview initiated by law enforcement officers investigating the charged crime, so long as defendant's waiver is voluntary, knowing and intelligent as shown by the particular facts and circumstances surrounding that case.

We expressly reject the rule of People v. Hobson, supra. In adopting a per se rule the New York court has

-8-

gone beyond the contours of Johnson v. Zerbst and its progeny in holding that despite "the particular facts and circumstances of [a] case, including the background, experience and conduct of the accused," Edwards v. Arizona (1981), ____ U.S. ___, 101 S.Ct. 1880, 1883-1884, 68 L.Ed.2d 378, 385, citing Zerbst, supra, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed.2d 1461, 1466, a defendant cannot effect a valid waiver of the right to counsel, without counsel's presence or consent. While we do not dispute the assertion that the presence of counsel provides a more effective safeguard against involuntary waiver than a written or oral Massiah-type warning, we emphatically disagree with the New York court's implicit assumption that written and oral warnings in absence of counsel cannot ensure that a defendant's right to counsel will be protected from unintentional relinquishment. The vast majority of jurisdictions have upheld counselless waivers which were obtained after written or oral warnings have been given. State v. McLucas (1977), 172 Conn. 542, 375 A.2d 1014, cert. denied, 434 U.S. 855, 98 S.Ct. 174, 54 L.Ed.2d 126; Pierce v. State (1975), 235 Ga. 237, 219 S.E.2d 158; State v. Ruth (1981), 102 Id. 638, 637 P.2d 415; People v. Aldridge (1979), 68 Ill.App.3d 181, 24 Ill.Dec. 484, 385 N.E.2d 396; State v. Costa (1980), 228 Kan. 308, 613 P.2d 1359; Watson v. State (1977), 35 Md.App. 381, 370 A.2d 1149, aff'd, 282 Md. 73, 382 A.2d 574, cert. denied, (1978) 474 U.S. 908, 98 S.Ct. 3100, 57 L.Ed.2d 1140; State v. Williams (Mo.App. 1978), 566 S.W.2d 841; People v. Green (1979), ____ Mich. ____, 274 N.W.2d 488; Giddings v. State (Minn. 1980), 290 N.W.2d 595; State v. Jackson (1980), 205 Neb. 806, 290 N.W.2d 458; State v. Romero (1982), 56 N.C.App. 48, 286 S.E.2d 903; Matter of Sanders (1982), 56

Or.App. 724, 643 P.2d 384; Commonwealth v. Lowery (1980), 276 Pa.S. 569, 419 A.2d 604; McPherson v. State (Tenn.Cr.App. 1977), 562 S.W.2d 210; Lamb v. Commonwealth (1976), 217 Va. 307, 227 S.E.2d 737; State v. Clawson (W.Va. 1980), 270 S.E.2d 659; Jordan v. State (1980), 93 Wis.2d 449, 287 N.W.2d 509.

In rejecting People v. Hobson, supra, we also note the language in another Sixth Amendment case, United States v. Henry (1980), 447 U.S. 264, 100 S.Ct. 2183, 2189, fn.14, 65 L.Ed.2d 115, wherein Mr. Chief Justice Burger stated that bar association disciplinary rules have no constitutional bearing. See also, Massiah v. United States, supra, 377 U.S. 201, 210, 84 S.Ct. 1199, 1205 (White J., dissenting); United States v. Thomas (10th Cir. 1973), 474 F.2d 110, 112, cert. denied, 412 U.S. 932, 93 S.Ct. 2758, 37 L.Ed.2d 160; State v. Richmond (1976), 114 Ariz. 186, 560 P.2d 41, 46, cert. denied, 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101; State v. Ruth, supra, 637 P.2d 415, 417; State v. Nicholson (1969), 77 Wash.2d 45, 463 P.2d 633. We agree. "The admissibility of evidence in a court of law . . . is normally determined by reference to relevant constitutional and statutory provisions, applicable court rules and pertinent common-law doctrines. Codes of professional conduct play no part in such decisions." People v. Green, supra, 274 N.W.2d at 454.

Careful review of the line of cases following Massiah reveals that the United States Supreme Court has not interpreted the Sixth and Fourteenth Amendments to require counsel's notice or agreement before an effective waiver can be found. What Massiah, Brewer and Henry stand for is the proposition that federal and state agents cannot deliberately elicit incriminating evidence from an indicted defendant in

defense counsel's absence, unless an intentional relinquishment of the right to counsel has been secured from defendant. In none of these cases was defendant given an express opportunity, as was defendant here, to effectively assert or waive his right to counsel. Unlike Norgaard who voluntarily and knowingly participated in a formal interview conducted by an identified criminal investigator, Massiah, Brewer and Henry were the objects of surreptitious, subtle investigative techniques deliberately designed to secure incriminating evidence from unwitting defendants.

Defendant mistakenly equates the express agreement between police and defense counsel in Brewer v. Williams, supra, with the Roosevelt County Attorney's policy not to interview defendants without notifying defense counsel. The significance of the agreement in Brewer was not its breach but the fact that the breach resulted in an impermissible interference with defendant's right to counsel. Agent Carrell's decision may have eroded trust between the Roosevelt County Attorney and defense counsel but it did not produce an unintentional abandonment of a constitutional right. What is constitutionally guaranteed here is defendant's right to assistance of counsel, not defense counsel's right to assist defendant.

In an attempt to underscore his Sixth Amendment Brewer-Hobson contentions, defendant's brief draws much attention to the facts and circumstances surrounding defendant's waiver, however, defendant does not directly challenge the District Court's conclusion that defendant executed a voluntary, knowing and intelligent waiver of his right to counsel.

We nevertheless have reviewed the record and the District Court's order and memorandum opinion. It is evident that the District Court applied the appropriate test to determine whether defendant made a valid waiver of his rights and concluded that a knowing waiver was given. Finding no legal error and substantial credible evidence to support the District Court's findings, the District Court's conclusion that a valid waiver was effected will not be disturbed. State v. Plouffe (1982), _____ Mont. _____, 646 P.2d 533, 39 St.Rep. 1064.

## II.

Defendant contends that the District Court erred when it refused to permit Howard Kelsey to testify to the fact that shortly before the crime occurred, two men, other than defendant, threatened Stanley Nees' life. Defendant would have the declarations made by Nees admitted under one of three exceptions to the hearsay rule: (i) the excited utterance exception under Mont.R.Evid., Rule 803(2); (ii) the statement against interest exception under Mont.R.Evid., Rule 804(b)(3); or (iii) the catch-all "other exceptions" category of Mont.R.Evid., Rule 804(b)(5).

As a general rule, the question of admissibility under a hearsay exception is left to the sound legal discretion of the trial court; only a case of manifest abuse of discretion will warrant reversal on appeal. State v. Caryl (1975), 168 Mont. 414, 543 P.2d 389.

We find no abuse of discretion here. One hour had passed between when Nees had an argument with two men and he recounted the contents of that argument to Kelsey. Given the time lapse and the fact that the event precipitating excitement was a verbal argument rather than an assault with

a weapon, under State v. Swazio (1977), 173 Mont. 440, 568 P.2d 124, it was reasonable for the District Court to conclude that the "excited utterance exception" should not apply.

Regarding defendant's "statement against interest" assertion, we find it to be too tenuous to warrant serious consideration, thus, we cannot here fault the District Court for not accepting it.

Defendant's third evidentiary argument deserves comment. Defendant argues that the statement made by Nees to Kelsey has comparable circumstantial guarantees of trustworthiness as the other specified exceptions to the hearsay rule.

The only opportunity this Court has had to discuss the "comparable trustworthiness" exception was in a dissenting opinion to Jacques v. Montana National Guard (1982), ____ Mont. ____, ____ P.2d ____, 39 St.Rep. 1565 (Harrison, J., dissenting). There, Justice Harrison, referring to the commission comments, recognized and liberally applied the guidelines set forth in the federal counterpart to this section. Those criteria are: (1) the statement is offered as evidence of a material fact; (2) it is more probative on the point for which it was offered than any other evidence; and (3) the general purposes of the rules and the interests of justice will be served by its admission. Rule 804(b)(5), Fed.R.Evid.

Unlike Jacques, where the excluded testimony was arguably the lynch pin of plaintiff's case, the testimony here is but tangentially related to the critical question of who killed Stanley Nees, Leota Hoye and Mildred Geer. Against an evidentiary backdrop that included all but a confession by defendant that he committed the homicides, it cannot be

seriously contended that interests of justice were frustrated by the exclusion of such testimony.

### III.

Defendant's final contention is that he was entitled to an instruction on the lesser included offense of mitigated deliberate homicide. In support of his argument, he refers to defendant's thirteen-year history of suffering from a mental illness and his expressed concern about the financial problems his father was experiencing.

Defendant correctly relies on State v. Gopher (1981), _____ Mont. _____, 633 P.2d 1195, 1196, 38 St.Rep. 1521, 1523, for the rule that "if any evidence exists in the record which would permit the jury to rationally find [defendant] guilty of a lesser offense and acquit him of a greater," a defendant is entitled to instructions on lesser included offenses. However, the difficulty with defendant's final contention is not its legal bearing, but its lack of evidentiary support.

In his initial brief, defendant as much as concedes that, standing alone, defendant's concern for his father's financial well-being would not suffice to support an instruction on mitigated deliberate homicide. We agree. No evidence was presented at trial regarding the nature or extent of defendant's mental condition. Dr. Stratford testified at a pretrial suppression hearing. The only other evidence of defendant's mental history was presented to the court for its sentencing considerations. Without that context or other evidentiary support, it cannot be said that there was any evidence to support a theory that defendant acted under the influence of extreme mental or emotional stress for which there is a reasonable explanation or excuse.

Affirmed.

_____
Justice

-14-

We Concur:

_Frank J. Haswell_
Chief Justice

_John Conway Harrison_

_Gene B. Daly_

_____

_____
Justices

Mr. Justice John C. Sheehy, dissenting:

I dissent.

A casual reader of the foregoing opinion might wonder why anyone would dissent in this case.  The answer is that additional facts are needed to give a full background of what happened here.

The killings in this case occurred on February 25, 1981.  From February 26, 1981 onward, William Norgaard was the prime suspect in this case.  He was hospitalized most of the time from February 26, 1981, until his arrest on March 4, 1981.  While he was not technically "in custody" in the period prior to March 4, 1981, he was subjected to interrogation by the authorities, including Agent Carrell, on several occasions.

Norgaard was interviewed, or an interview of him was attempted five times between February 26, and March 4, the day he was charged with the crimes.  On three of those occasions, on February 26, 1981, in Poplar, Montana, on March 2, 1981, when he was in the hospital, and on March 4, 1981, after he had been arraigned, written waivers of his right to have counsel present were signed by Norgaard.  At all other times, and there were many, including the two interviews by Agent Carrell in Missoula, no written waivers were acquired, although Agent Carrell testified that oral Miranda warnings were given to Norgaard.

Norgaard was in the hospital, either in Wolf Point or in Missoula, Montana, most of the time from and after February 26, 1981.

Norgaard, to put it mildly, was a sick man.  Approximately 26 years old, he had suffered most of his teen and

-16-

adult life from the disease of colitis.  When he arrived in the hospital in Missoula on March 11, 1981, he was weak from loss of blood, and had undergone a period of sustained rectal bleeding.  Dr. Stratford, a psychiatrist, testified that when defendant came to Missoula "he needed to be seen by [doctors] who see this kind of people every day, an internist and a gastro-enterologist."

Colitis was not his only illness.  Since the defendant was 13 years old, he had "historically a severe mental illness, and he has undergone years and years of treatment, electric shock treatments, massive doses of anti-psychotics, multiple years of therapy with a psychiatrist, and in-patient and outpatient . . ." treatment.  Dr. Stratford, who had never seen the defendant before, inadvertently lowered the defendant's prescription of Haldol, an anti-psychotic drug, to one milligram per day whereas in the previous weeks in Wolf Point, he had been given doses each day of Haldol ranging from 6 milligrams to 22.5 milligrams.

The defendant was arraigned on March 4, 1981, in Wolf Point.  The District Court judge came to the defendant's hospital room in order to arraign him.  An attorney was not appointed for him at that time because his family indicated they might seek their own counsel.

On March 10, 1981, the District Court appointed Francis McCarvel, of Glasgow, to represent the defendant.  At the time of Mr. McCarvel's appointment, the defendant was in Missoula, Montana, where he had been sent by the State for psychiatric evaluation by Dr. Stratford.  Missoula is 439 miles from Glasgow, where McCarvel resides and has his offices, and 488 miles from Wolf Point, where the charges were pending against the defendant.

-17-

James McCann is the county attorney in Roosevelt County, of which the county seat is Wolf Point, where the crimes were committed. Although McCarvel resides in Glasgow, he is frequently called on to represent defendants by appointment in the judicial district including Roosevelt County. There is a standing agreement between attorneys McCann and McCarvel that no defendant that McCarvel is appointed to represent will be interrogated in McCarvel's absence by law enforcement officials. It is obvious that McCarvel saw no reason to hurry to Missoula, nearly 500 miles away, to interview his newly-found client until the psychiatric evaluation of the defendant in Missoula had been completed.

On March 11, 1981, Dr. Stratford, in Missoula, called the special prosecutor in the Attorney General's office in Helena, Montana, some 120 miles away to tell the special prosecutor that the defendant should have an attorney because he was beginning to make incriminating statements against his own interests. The special prosecutor called into his office in Helena Special Agent Carrell, and together they discussed the propriety and ethics of Carrell attempting to interview the defendant in the absence of his counsel and before his counsel had a chance to consult with his client and advise him of his right to protect himself in this case. The special prosecutor left the decision up to the agent and Carrell lost no time in proceeding immediately to Missoula to interview Norgaard, which he did beginning that evening of March 11, 1981.

The handwritten notes of Agent Carrell respecting his interview of Norgaard are more revealing than anything I could write or the majority has said with respect to the consent of Norgaard to the interview and his purported relinquishment of his right to counsel:

-18-

"2045-2145

"[8:45 p.m.-9:45 p.m.]

"Interviewed Norgaard

"Advised rights

"   "      Attorney McCarvel had been appointed

"   "      advised charged w/

"   "      who I was & why I was there.  Nodded
-understood all -

"Nodding & shaking of head"

Also revealing from the handwritten notes of

Agent Carrell are his recorded statements to Norgaard:

"Explained to Bill preponderence of evidence
against him

"shell casings match

"possibility of fingerprints on casings"

On the morning of March 12, 1981, Agent Carrell came

again to the hospital room to interview Norgaard.  Again

his notes are revealing:

"Introduced myself against [sic] as CIB Agent-
showed Bill badge - took it looked at it.

"Advised Bill of rights verbally & specifically
advised him he did not have to talk to me -
said he understood.

"Again advised Bill an attorney named Jim
McCarvel had been appointed by the court
to represent him - he understood

"Advised Bill he could have attorney present
or talk to him before talking to me - he
understood

"Advised Bill again he was charged with the
homicide of Stanley Nees, Mildred Geer,
and Leota Hoye - He understood.

"Asked again if he knew who I was

"He said 'You're a police officer?'  I replied
yes."

And finally, as startling as it is revealing, are

the notes respecting the conclusion of the interview:

-19-

"Advised 'You're attorney, Mr. McCarvel, will probably be getting in touch w/you.' reply 'What's the difference between an attorney and a lawyer?' I stated 'They're the same thing.'

"Bill asked 'Will he represent me?' I replied, 'He has been appointed to represent you. Anything he does will be what he considers to be in your best interests. He's a good lawyer.'

"Bill asked 'When will he talk to me?' I replied 'I don't know, but it will probably be in the next few days.'"

It is true that Dr. Stratford testified that on the night of March 11, 1981 and on the morning of March 12, 1981, Norgaard was capable of making decisions, even though his intelligence was in the lower normal range. What is sadly lacking in the testimony respecting his mental ability, however, is whether he had the requisite knowledge to make a knowing and voluntary waiver of his right to counsel. His question to Carrell as to what was the difference between an attorney and a lawyer indicates a very rudimentary knowledge of what he was about or perhaps his inability to grasp what was being said to him respecting his right to have counsel present. That is one of the reasons why I think the State has not carried its "heavy burden" of showing that Norgaard's waiver of right to counsel was knowing and voluntary.

I also believe that the evidence does not sustain a knowing and voluntary waiver of Norgaard's right to have counsel present during his interviews because he was never given a chance to consult with his own counsel to learn exactly how those rights operate. Here the State deliberately beat Norgaard's counsel to the punch, in spite of the long-standing agreement between McCarvel and the county attorney of Roosevelt County to respect McCarvel's right, and it is a right, of fair and influence-free consultation with his clients under his appointments by the court.

-20-

It is on a fact situation such as we find here that the New York court adopted its _per se_ rule in People v. Hobson, supra, cited in the majority opinion. Norgaard's evident confusion as to what a lawyer is; the surreptitious trip to Missoula by Agent Carrell; the special prosecutor's calling in of Agent Carrell when he learned that Norgaard was becoming talkative; the lack of an immediate telephone call by the state counsel to the appointed attorney; and the lack of a written Miranda waiver from Norgaard in the two crucial interviews in Missoula, all lead me to conclude that the State might well stretch a point when its agents testify that Norgaard's consent to be interrogated in the absence of counsel was knowing and voluntary.

I would suppress the statements made by Norgaard in the Missoula interviews, and remand the cause for a new trial. There is probably enough remaining evidence against him to bring about his conviction in any event.

One's credibility is at nadir when it is more important to win than to be honorable.

If another trial were granted, I would also instruct the District Court to ascertain the physical and mental health of the defendant at the time of the crime. Here no evidence was given on that important aspect of the case. Then certainly the jury could decide whether these killings involved mitigated deliberate homicide under proper evidential background. The jury in this case convicted the defendant without any knowledge of his mental difficulties.

John C. Sheehy
_____
Justice

I join in the dissent of Justice Sheehy.

Daniel J. Shea
_____
Justice

-21-